**Oliver R. JOHNSON, a/k/a Oliver Jolley, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 9981.**

District of Columbia Court of Appeals.

Argued June 10, 1976.

Decided Oct. 5, 1976.

---

William H. Allen, Washington, D.C., appointed by this court, for appellant.

Mark H. Tuohey III, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry, William D. Pease, Barry L. Leibowitz and Henry H. Kennedy, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FICKLING, HARRIS and MACK, Associate Judges.

FICKLING, Associate Judge:

Appellant was convicted following a jury trial of taking indecent liberties with a minor child in violation of D.C.Code 1973, § 22–3501(a). Appellant's primary contention on appeal is that the court abused its discretion by permitting the child to testify at trial. Appellant also contends that he was denied the effective assistance of counsel and that the trial court erred in allowing the grand jury indictment to be amended. After careful examination of the entire record of this case, we affirm.

Appellant was charged with taking indecent liberties with his daughter, Sherri. Prior to receiving any testimony at trial, the court granted defense counsel's request for a *voir dire* examination to determine whether Sherri was competent to testify.[1] In reply to questions put to her during *voir dire*, Sherri testified that she knew the difference between telling the truth and telling a lie; that telling the truth meant to never tell stories; that she understood that she would go to jail if she told a lie; and that she was going to tell the truth. During her testimony, however, she described herself at different times as 5, 6, 8, and 9 years old;[2] misstated the age of her older sister, Joyce;[3] indicated that she did not know how to count or to read;[4] said that she did not understand the difference between a day and a month; could not give her street address or telephone number;[5] and confused her aunt with her sister.[6]

---

1. The *voir dire* examination was conducted in the presence of the jury, which gave the jurors an opportunity to independently evaluate Sherri's qualifications as a witness.

2. Sherri's correct age at the time of trial cannot be clearly ascertained from the record. Defense counsel and the prosecutor both thought that Sherri was 6 years old. Although the government continues to maintain that Sherri was 6, counsel for appellant on appeal states that Sherri was 5. Sherri's older sister testified that Sherri was 6 years old, but her mother testified that Sherri was 7. Sherri flatly admitted that she did not know how old she was.

3. According to Sherri's testimony, her 11-year-old sister, Joyce, was 15.

4. In response to questions by the prosecutor during *voir dire*, however, Sherri demonstrated that she could count to at least five.

5. Although Sherri was unable to give the street number of the house in which she lived, she correctly testified that she lived on Hanover Street in the District of Columbia.

6. Sherri testified that her 17-year-old aunt, Betty, was one of her three sisters. In fact, Sherri had only two sisters—her sister, Joyce, and her half-sister, Yvette.

After the *voir dire* examination, the trial court ruled that Sherri was competent to testify.

The events which led to appellant's conviction took place sometime during the evening of October 11, 1974, in the living room of an apartment where appellant lived with his common-law wife and her six children.[7] The government's case consisted of evidence that, at approximately 7 p.m., Sherri's mother left the apartment to visit a sick relative, leaving the children in the care of her brother, David Chappel, and appellant. About an hour later, after consuming a few drinks with appellant, Mr. Chappel also left.

Sherri testified that after her uncle left the apartment, appellant told all of her brothers and sisters to go to bed, leaving her alone on the living room couch with appellant. She testified further that appellant put "grease" and then his finger in her sexual organs, which caused her to cry. Afterwards, appellant told her to take a bath and go to bed. According to Sherri, she was bleeding when her mother returned to the apartment that evening and was taken to the hospital where she was examined by a doctor. While at the hospital, Sherri told a Metropolitan Police detective what had happened and identified appellant as her assailant.

Sherri's testimony was corroborated by the testimony of several other government witnesses. Her older sister, Joyce,[8] testified that after her mother left the apartment, appellant told all of the children except Sherri to take baths. Sherri, however, was told to go into the living room. Sometime after the children had gone to bed, Joyce heard Sherri scream. Later,

after Sherri had taken a bath, Joyce saw her get into bed.

Sherri's mother testified that when she returned to the apartment at about 11 p.m., she noticed that the covering on the living room couch had been stained with what appeared to be grease and blood.[9] When she learned that appellant had not allowed Sherri to take a bath or to go to bed before all of the other children had done so, she examined Sherri and discovered a small split in the little girl's vagina. She testified that she had not noticed the tear when she washed Sherri the night before. She then took Sherri to D.C. General Hospital, where a doctor told her that someone had "tampered" with Sherri's body.

The doctor who examined Sherri testified that his examination revealed a small tear in her vagina which, in his opinion, had been caused by a "blunt trauma" within the previous twenty-four to forty-eight hours. The doctor testified that the tear could have been caused by an attempt to forcibly push any firm object, such as an adult's finger, through the little girl's hymenal ring.

Appellant took the stand in his own defense and denied taking indecent liberties with his daughter. He testified that he had instructed all of the children to prepare for bed and that Sherri had taken her turn in the bathroom before the two eldest boys.[10] In an attempt to provide a plausible explanation for Sherri's condition, appellant testified that the day before the incident he had learned that Sherri had been in the bathroom with a neighborhood boy. According to appellant, he had spanked Sherri when she confessed that the 10-year-old boy had "done it" to her in the

---

7. Two of the six children, Sherri and Joyce, were fathered by appellant.

8. Although appellant contends that the trial court abused its discretion by permitting Sherri to testify, appellant does not contend that Sherri's sister, Joyce, was incompetent to testify.

9. The covering was laundered shortly after the incident, and an expert in the field of forensic serology testified that his laboratory tests had detected semen on the covering, but no traces of blood.

10. Neither of the two boys was called to testify.

bathroom. Later that evening, Sherri's mother spanked Sherri again after she questioned Sherri about the episode and had been told that the boy had "done it" to her." [11]

I

Appellant initially contends that the trial court abused its discretion by permitting Sherri to testify at trial. We first consider appellant's contention that the trial court utilized an incorrect legal standard in ruling that Sherri was competent to testify. Appellant argues that the trial court failed to take into account Sherri's allegedly limited intellectual capacity in determining that she was a competent witness.

■ There is no rule of law in the District of Columbia which conclusively presumes that a child under a certain age lacks the capacity to testify. The determination of whether a child is legally competent to testify is a matter which rests within the broad discretion of the trial court. Because the trial court has an opportunity to observe the witness' conduct and demeanor at trial, the court's decision will not be disturbed on appeal unless shown to be clearly erroneous. *Wheeler v. United States,* 159 U.S. 523, 16 S.Ct. 93, 40 L.Ed. 244 (1895); *Posey v. United States,* D.C.Mun.App., 41 A.2d 300 (1945); *Doran v. United States,* 92 U.S.App.D.C. 305, 205 F.2d 717, *cert. denied,* 346 U.S. 828, 74 S. Ct. 49, 98 L.Ed. 352 (1953).[12]

■ The competency of a child to testify "depends on the capacity and intelligence of the child, [her] appreciation of the difference between truth and falsehood, as well as of [her] duty to tell the former." *In re Lewis,* D.C.Mun.App., 88 A.2d 582, 583 (1952), quoting *Wheeler v. United States, supra,* 159 U.S. at 525, 16 S. Ct. 93. In ruling that Sherri was competent to testify, the trial court set forth the legal standard for judging the competency of a witness as follows:

> [T]he test before the Court is twofold, *whether or not the child has the intelligence to understand the difference between telling the truth and telling a lie* and whether, in fact, the child knows the difference between telling the truth and telling a lie. [Emphasis added.]

This statement establishes beyond doubt that the trial court did consider Sherri's intellectual capacity in determining that she was a competent witness. Furthermore, the record reveals that the trial court correctly formulated the legal standard of competency in its instructions to the jury.[13] Appellant's contention that the trial court utilized an incorrect legal standard in ruling that Sherri was competent to testify is, therefore, without merit.

■ We next consider appellant's contention that Sherri was not intelligent enough to qualify as a competent witness. The most important factor in determining

---

11. Sherri was not called upon to explain exactly what had been "done" to her. Sherri's sister, Joyce, and her uncle, David Chappel, both testified that Sherri had been in the bathroom with her brother and one of his friends while the two boys were attempting to fix a broken light switch.

12. The current trend is to regard the competency of a witness as a question of credibility for the jury and to admit the testimony for what it is worth. C. McCormick, Evidence § 62 (2d ed. 1972). Note, for example, that the newly enacted Federal Rules of Evidence do not specify any mental qualifications for testifying as a witness. Fed.R.Evid. 601. Nevertheless, this court has yet to adopt

the rule that the competency of a witness to testify is solely a matter of credibility. *See Edmondson v. United States,* D.C.App., 346 A.2d 515 (1975).

13. The trial court instructed the jury as follows:

> A child is not disqualified as a witness merely because—by reason of the child's youth. There is no precise age which determines the competency of a child to testify. *This depends on the capacity and intelligence of the child,* the child's understanding of the difference between truth and falsehood, and the child's appreciation of the child's duty to tell the truth. [Emphasis added.]

the competency of a child as a witness is "the child's ability to recollect the events about which she was to testify." *Edmondson v. United States*, D.C.App., 346 A.2d 515, 516 (1975) (footnote omitted). *See also United States v. Hardin*, 143 U.S. App.D.C. 320, 443 F.2d 735 (1970).

The ultimate test of competence of a young child is whether [she] has the requisite intelligence and mental capacity to understand, recall and narrate [her] impressions of an occurrence. [*United States v. Schoefield*, 150 U.S.App.D.C. 380, 382, 465 F.2d 560, 562, *cert. denied*, 409 U.S. 881, 93 S.Ct. 210, 34 L.Ed.2d 136 (1972).]

An appellate court, in determining whether the trial court abused its discretion by permitting a child to testify, may properly examine the actual testimony of the child. *Edmondson v. United States, supra; United States v. Jones*, 157 U.S. App.D.C. 158, 482 F.2d 747 (1973). Nevertheless, we must take into account the fact that we cannot review the child's conduct and demeanor in the courtroom. *See Wheeler v. United States, supra.* Although Sherri's testimony during *voir dire* was at times confused and inconsistent, she amply demonstrated her ability to testify as to what she observed. Her testimony at trial was a comprehensible and internally consistent account of what happened.[14] The fact that she gave confused or inconsistent answers to questions which were totally unrelated to the incident does not justify disqualifying her as a witness. Naturally, a young girl who has been sexually molested by her own father would be terrified to testify about the incident in open court before jurors, lawyers, and a judge.

It is understandable that this young girl, in such a strange and embarrassing setting, would give confusing or inconsistent answers in response to abstract questions concerning matters unrelated to the incident, and still have sufficient capacity for observation, recollection, and communication, to qualify as a witness. Accordingly, we hold that the trial court did not abuse its discretion by permitting the girl to testify.

II

Appellant also contends that he was denied the effective assistance of counsel. After several acrimonious exchanges between the prosecutor and defense counsel, the trial court held defense counsel in contempt and ordered that he be incarcerated overnight.[15] Appellant contends that defense counsel was unable to effectively assist appellant in his defense after being cited for contempt. More specifically, appellant argues that defense counsel was so upset by his citation for contempt that he was unable to effectively question Sherri on recross-examination as to whether her testimony was motivated by the fact that she was angry with appellant because he had spanked her the day before the incident.

In order to prevail on his claim of ineffective assistance of counsel, appellant must show that his counsel was so ineffective that he was deprived of a substantial defense. *White v. United States*, D.C. App., 358 A.2d 645 (1976); *Bruce v. United States*, 126 U.S.App.D.C. 336, 379 F.2d 113 (1967). There is nothing in the record to support the contention that defense counsel's representation of appellant was significantly impaired by his citation for

14. In this case, as in so many other cases involving the sexual molestation of a young child, there is considerable circumstantial evidence of appellant's guilt, but the only direct eyewitness testimony is that of the child, herself. However, the child's testimony is amply corroborated by the prosecution's other witnesses.

15. Defense counsel's citation for contempt was subsequently rescinded by the trial court, and the question of whether defense counsel was justifiably held in contempt is not before this court.

contempt. Although defense counsel requested a continuance for the purpose of obtaining a lawyer to represent him at the contempt hearing, defense counsel informed the court that he was able to effectively assist his client: "I can assist my client, but I need help myself." He also told the court: "I want to continue with the trial, whatever happens."

■ Moreover, the record reveals that appellant's available defenses were fully developed during the course of trial. Evidence that Sherri had been angry with appellant for spanking her was elicited prior to defense counsel's citation for contempt; Sherri was questioned at length during cross-examination about the episode; and appellant afterwards took the stand in his own defense and testified about the circumstances of the spanking. Defense counsel's decision not to question Sherri further on recross-examination was a tactical decision prompted by his justifiable apprehension that further examination would engender sympathy for the girl, who had begun to cry shortly after defense counsel was cited for contempt. We conclude, therefore, that appellant was not denied his right to the effective assistance of counsel.

### III

Finally, appellant contends that the trial court erred in allowing the grand jury indictment to be amended. Appellant was charged in a one-count indictment which named "Oliver R. Johnson" as the defendant. At the begining of appellant's trial, the court allowed the indictment to be amended to name "Oliver Jolley" as the defendant. Appellant argues that the indictment was fatally defective and that, by permitting the indictment to be amended, the trial court deprived him of his right to indictment by grand jury.

■ An indictment generally may be amended when the change concerns a matter of form rather than substance. *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). Amendments with respect to the name of the defendant are permitted unless the change is prejudicial to the defendant's substantial rights. *United States v. Fawcett,* 115 F.2d 764 (3d Cir.1940). *See generally* 14 A.L.R.3d 1358, § 3[c] (1967). The test as to whether a defendant is prejudiced by an amendment to an indictment is as follows:

> . . . whether a defense under an indictment as it originally stood would be equally available after the amendment is made, and whether any evidence the defendant might have would be equally applicable to the indictment in the one form as in the other . . .. [*United States v. Fawcett, supra* at 767.]

In the instant case, there was never any question as to the true identity of the defendant. The amendment did not change the nature of the crime or charge a different offense from that found by the grand jury. The indictment apprised appellant of the charges against him so that he could adequately prepare his defense, and it described the crime with sufficient specificity to enable appellant to protect against reprosecution for the same offense. Accordingly, we conclude that the amendment of the indictment to reflect appellant's true name did not prejudicially affect appellant's substantial rights and that the trial court did not err in permitting the indictment to be amended. *See* D.C.Code 1973, § 11–721(e).

*Affirmed.*