Albert B. SMITH, Appellant,

v.

UNITED STATES, Appellee.

No. 13697.

District of Columbia Court of Appeals.

Argued July 25, 1979.
Decided April 30, 1980.

Before NEWMAN, Chief Judge, and KERN and FERREN, Associate Judges.

FERREN, Associate Judge:

A jury convicted Albert B. Smith of second degree murder while armed, D.C. Code 1973, §§ 22–2403, –3202, and unlawful possession of a pistol, D.C.Code 1973, § 22–3203. On appeal, he asserts that the trial court erred in ruling that (1) the 14-month delay in executing the warrant for his arrest did not violate his rights to due process and a speedy trial, and that (2) the victim's eight-year old daughter was competent to testify.[1] We affirm the convictions, although we remand the case for correction of an illegal sentence.

## I.

The government's evidence showed that in 1973 the decedent, Regina Simms, and her daughter, Latita (then approximately three and one-half years old), were living in an apartment with Regina's brother, Maurice Simms. When Albert B. Smith (appellant) moved in with Regina sometime in the early summer of 1973, Maurice moved to another apartment in the same building.[2] On the afternoon of September 15, 1973, Regina's long-time friend, Sylvia Morrison, found Regina shot to death in her apart-

Allen S. Rugg, Alexandria, Va., for appellant.

John H. Sturc, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., at the time the brief was filed, John A. Terry, Michael W. Farrell, and James M. Hanny, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

1. Appellant also contends that (1) his rights under the Fifth Amendment and Super.Ct.Cr.R. 43(a) were violated because he was not present when the trial court excused the jury for the luncheon recess on the third day of the trial, and that (2) the trial court erred in denying his motion for a mistrial based on the court reporter's spontaneous remark, "[t]hat's dangerous, judge" (spoken as defense counsel placed the murder weapon in front of appellant while he was on the stand). We conclude that any error resulting from appellant's absence while the trial court performed the ministerial act of excusing the jury for lunch was harmless. Appellant's allegations of prejudice—that his absence "compellingly" conveyed a message to the jury that he was incarcerated and "may well have lent seeming substantiation" to the court reporter's remarks on appellant's dangerousness—are insufficient to require reversal. See Smith v. United States, D.C.App., 389 A.2d 1356, 1361, cert. denied, 439 U.S. 1048, 99 S.Ct.

726, 58 L.Ed.2d 707 (1978); Springs v. United States, D.C.App., 311 A.2d 499, 500 n.1 (1973). We also conclude that the record reveals no clear abuse of discretion with respect to the trial court's denial of appellant's motion for a mistrial. See, e. g., Christian v. United States, D.C.App., 394 A.2d 1, 23 (1978), cert. denied, 442 U.S. 944, 61 L.Ed.2d 315, 99 S.Ct. 2889 (1979).

2. Various government witnesses at the trial described the relationship between Regina and appellant as a stormy one. Maurice Simms, who visited the couple almost every day, testified that they argued constantly. Thomasine Thomas, who lived across the hall from Regina testified that she heard the two arguing about money almost every night. Mark Wrice, Thomas' son (who was nine years old in 1973) also testified that the couple argued a great deal.

ment.[3] Morrison summoned the police, who arrived minutes later.[4] The police saw no sign of forcible entry into the apartment but found a .38 caliber revolver, containing one expended round of ammunition and four live shells, next to the body, along with a bottle of pills. A box of bullets was found in the dresser in the master bedroom. On top of the dresser was a picture of Regina Simms and appellant, as well as several pieces of mail addressed to appellant. Men's clothing was in the closet and in the dresser. A warrant was issued for appellant's arrest shortly after the murder. Over the ensuing weeks, the police made futile attempts to find appellant at former addresses.

In the summer of 1974, Theresa D. Martin and her sister, Mary Woodard, met appellant—who identified himself as Bruce Green—in Los Angeles, California. After "Green" had lived with Martin for several months, he confided to her and Woodard that he was from Washington, D.C., and that he had left the city for Los Angeles because he had killed a woman. In March 1976, appellant was arrested on an unrelated charge by Terry L. Crabtree, then an officer with the Los Angeles Police Department (LAPD). At the scene of the arrest, appellant told Crabtree that he was Bruce Green, had lived in Los Angeles for five years, and had come to Los Angeles "from nowhere." Appellant's fingerprints were taken and submitted for comparison to the National Crime Information Center computer.[5] Appellant, meanwhile, was placed in a holding cell. Soon thereafter, as Officer Crabtree was walking toward the booking area of the stationhouse, appellant knocked on the window of his cell and requested a cigarette. Crabtree had learned that there might be outstanding warrants for appellant's arrest related to unspecified offenses in the east; he mentioned the possible warrants to appellant. Crabtree testified at trial that appellant then "swallowed several times, sighed real deep, water came to his eyes." He testified further that appellant told him:

"Ya, man, I am wanted for murder in Washington, D.C. . . . . I went back to the pad, and there was a dude in the pad. My old lady was laying on the bed. A man has got to have protection, and I had a piece of protection. She died."

I believe also that he [appellant] stated that "I was trying to keep what was mine." At that time, I said, "You mean you dumped her," meaning, in the particular area where I was working, did you kill her? He said, "Yes, I dumped her."

Q. [By the prosecutor]: Was there any other conversation after he said he had dumped her, or he had killed her?

A. Yes, I said, "Are you sure she died?" At that time he stated to me, "Yes, she died. I called, and they told me that she had died. I went under, and then I found out the police was hunting me, and I went to L.A." [6]

---

3. Morrison testified at trial that she arrived at the decedent's address around 12:45 p. m. on September 15, 1973. She found Latita Simms playing by herself in the courtyard of the building. When Morrison asked the child where her mother was, Latita replied, "She is upstairs, lying on the floor, dead." Morrison found the door to Regina's apartment slightly ajar. Pushing it open, she entered and found the decedent's body lying awkwardly on the bathroom floor. Decedent was nude except for stockings, a top and a wig that had fallen askew on the floor.

4. Dr. Brian D. Blackbourne, Deputy Medical Examiner for the District of Columbia, arrived at Regina Simms' apartment later on the afternoon of September 15. He concluded that the death occurred between 5:30 and 9:30 a. m. on

that morning. An autopsy later revealed that Simms died from a gunshot that entered the upper left side of her head. The wound's location was inconsistent with suicide. The bullet Dr. Blackbourne removed from Simms' brain was fired from a .38 caliber pistol.

5. The National Crime Information Center is a component of the Federal Bureau of Investigation and maintains a computer listing of "wanted" persons by fingerprint classification.

6. Crabtree's testimony about appellant's confession continued as follows:

Q. Did you ask Mr. Green what his name was, what his real name was?

A. Yes, I did. I asked him what name he had been using. He said, "Albert Smith."
. . .

After appellant admitted his true identity and confessed to the murder, the LAPD notified the Metropolitan Police Department, which issued another warrant for appellant's arrest on that charge on March 25, 1976.[7] Appellant was tried and convicted on the California charges on July 7, 1976. During his jail term for that offense, an extradition hearing was held pursuant to another arrest warrant based on revocation of probation for a previous District of Columbia conviction. California authorities, however, refused to release him until he had served the sentence imposed for the California offense which had led to his March 1976 arrest.

On December 21, 1976, appellant was returned to the District of Columbia. A Superior Court judge revoked his probation and sentenced him to a term of imprisonment for the probation violation. The Department of Corrections, however, inadvertently failed to notify the police department of appellant's return, resulting in a five and one-half month delay—until June 6, 1977— of the execution of the murder arrest warrant and presentment on the complaint.

Q. Now, sir was that the end of that particular conversation?

A. No. I believe he also stated that there was a little girl in the room. Following that statement, he also related to me the name of the victim was Regina Simms, and I don't recall the street name itself. I do recall it started with a "C," and it was in Washington, D.C.

\* \* \* \* \* \*

Q. Mr. Crabtree, did Mr. Smith, or Green, indicate—did he ask you anything about a weapon that was still at the scene of the murder or remained there after the murder?

A. Yes, sir. During the time that I was waiting for the booking procedures and going through the booking procedures, Mr. Green stated to me, asked me what I thought was going to happen. I replied that I didn't know, it depended on the evidence that had been compiled against him and the fingerprints on the gun, and things like that. He stated that his fingerprints were all over the gun; that he was probably the last person to touch it. Then he asked me if the little girl could say anything or knew anything about it.

Q. And what did you respond to that?

A. I said I didn't know at all. And then he stated, "Well, she was just a young kid."

On February 27, 1978—nine days before trial—appellant filed a Motion to Dismiss for Want of a Speedy Trial. He claimed that his Fifth Amendment due process right to a fair trial had been violated by the 14-month delay in the execution of a warrant for his arrest, since the District police had known his whereabouts during the entire period. He also claimed that his Sixth Amendment right to a speedy trial had been denied by a delay of nine months between the time of his arrest for murder and his trial. The trial court heard and denied the motion before trial. Following trial, the court entered a written memorandum opinion explaining its rulings on these claims.

Also before trial, appellant requested that the trial court conduct a *voir dire* of two government witnesses, Latita Simms (then age eight) and Mark Wrice (then age 13). He contended that both children were incompetent to testify because of their ages. The court conducted the *voir dire* with questioning first by the prosecutor, then by the court.[8] At its conclusion, the

Appellant filed a pre-trial motion to suppress these statements, contending that his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) had been violated. The trial court denied the motion; appellant does not appeal that ruling here.

7. The original murder warrant for Smith's arrest had been withdrawn several years after the murder but before appellant's capture in Los Angeles.

8. At the *voir dire*, Latita Simms testified that she was eight years old, her birthday was December 11, she was in the third grade, and she lived with her grandmother on Madison Street. She also told the court she knew the difference between what was true and false and had learned in school that telling the truth is right and telling a lie is wrong. She said she could remember what happened in 1973 when her mother died, and she promised to tell the court the truth about it. Mark Wrice testified that at the time of the murder he lived across the hall from decedent and Latita. He, too, told the court that he had learned the difference between lying and telling the truth and that he understood lying was wrong. He promised to tell the truth about what happened in 1973.

court found both witnesses competent to testify, subject to reconsideration.[9]

At trial, Latita Simms, who had been approximately three and one-half years old at the time of her mother's murder, testified that in 1973 appellant (who Latita knew as "Skeeter") had moved into their apartment. She identified appellant in court.[10] Latita testified that she had awakened early on the morning of September 15, 1973 and heard the voices of her mother and Skeeter, arguing. She then heard a loud bang, got up, stood behind the door to her mother's bedroom, and saw appellant going through the dresser drawer. Latita went up the hall to the bathroom, where she saw her mother lying on the floor. She saw appellant bend down and put something next to her mother's arms and legs. Appellant returned to the bedroom, took some clothes, and told Latita not to tell anybody. After appellant left the apartment, Latita went outdoors.

After testimony by government witnesses, the defense called several alibi witnesses. Appellant himself also testified, denying that he had made any admission to Officer Crabtree about the murder or the murder weapon, or about arguing with Regina Simms. He specifically denied killing the decedent.

The jury convicted appellant, and the trial court sentenced him to 15 years to life in prison for second degree murder while armed, and to three and one-half years to 10 years for unlawful possession of a pistol, the sentences to run concurrently. This appeal followed.

## II.

■ Appellant contends, first, that the trial court erred in ruling that the pre-arrest delay of 14 months between the second warrant for his arrest (March 25, 1976) and his initial presentment (June 6, 1977) violated his Fifth Amendment right to due process.[11]

A. To prevail on his Fifth Amendment claim, appellant must prove, at a minimum, that he suffered demonstrable prejudice as a result of the pre-arrest delay. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Tolliver v. United States*, D.C.App., 378 A.2d 679 (1977).[12] Prejudice alone, however, is not enough. The Supreme Court has underscored that

9. Appellant moved for a mistrial after Latita had testified at trial. At that time, the court reconsidered its earlier ruling, concluded once again that she was competent to testify, and denied the motion. The court considered the matter once more after the trial and concluded, in a memorandum opinion, that both children were competent to testify.

10. Latita also identified a pistol as the one appellant had had in his pocket when he first moved into the apartment. She remembered showing the pistol to Mark Wrice. Mark Wrice testified that he remembered the day he had been playing with Latita when she showed him a pistol that was kept in a dresser drawer in her mother's room.

11. Appellant also claims violation of his Sixth Amendment right to a speedy trial, stressing that substantial prejudice from pre-arrest delay "may cause" a period of post-arrest delay to be more prejudicial to a defendant. On this record, however, we agree with the trial court that appellant's *Sixth Amendment speedy trial* claim has no merit. The trial court concluded that the government had not delayed intentionally, appellant had failed to assert his speedy trial right until nine days before trial, and he had not stated sufficient prejudice in his claims that delay impaired trial preparation and enhanced the likelihood of the court's finding Latita Simms and Mark Wrice competent to testify.

12. In *United States v. Alston*, D.C.App., 412 A.2d 351 (1980) (en banc), we recognized that "prejudice to a fair [ ]trial," the relevant consideration in Fifth Amendment analysis, "is not necessarily congruent with the prejudice attributable to denial of a speedy trial," which is relevant in *Sixth Amendment analysis*. We viewed prejudice to defense preparation as one obvious factor in common, and incarceration that impacts on the ability to prepare for trial as another. However, we could not say "categorically" that incarceration and anxiety (two types of prejudice with Sixth Amendment significance) were appropriate Fifth Amendment concerns. *See id.* at 359. We need not comment further on the types of prejudice that may comprise a due process violation because appellant in the present case only alleges detriment associated with trial preparation.

"proof of prejudice is generally a necessary but not sufficient element of a due process claim[;] . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Lovasco, supra,* 431 U.S. at 790, 97 S.Ct. at 2048–2049; *accord, Tolliver, supra. See generally United States v. Alston,* D.C.App., 412 A.2d 351, at 359–362 (1980) (en banc) (post-trial appellate delay analyzed in Fifth Amendment due process framework).

■ In considering reasons for delay, the Supreme Court implicitly has held that, when coupled with prejudice to the accused, "intentional" government delay designed "to gain a tactical advantage over the accused" will support a Fifth Amendment claim. *Marion, supra,* 404 U.S. at 324, 92 S.Ct. at 465 (footnote omitted).[13] The Court also has intimated that a showing of government delay "incurred in reckless disregard of circumstances" may support such a claim. *See Lovasco, supra,* 431 U.S. at 795 n.17, 97 S.Ct. at 2051.[14] Neither the Supreme Court nor this court, however, has indicated that government delay attributable solely to negligence can violate due process. We conclude that, with the possible exception of a showing of severe prejudice from pre-arrest delay, such delay will not support a due process claim when the government's actions have been negligent, but not reckless or intentional.

■ B. In applying these criteria, we note first that appellant alleges prejudice on the ground that the 14-month pre-arrest delay enabled Latita Simms to become a competent witness.[15] This contention is insufficient to support a due process claim, however, because it is based on pure speculation. *See Hurt v. United States,* D.C. App., 314 A.2d 489, 494 (1974) (seven month pre-arrest delay of little significance in absence of any actual prejudice). Appellant has not advanced any persuasive reason why Latita Simms would have been found incompetent to testify at age six but competent at age eight. Children age six and younger have often been found competent to testify. *E. g., Wheeler v. United States,* 159 U.S. 523, 16 S.Ct. 93, 40 L.Ed. 244 (1895) (five and one-half year old witness); *Johnson v. United States,* D.C.App., 364 A.2d 1198 (1976) (witness was of undetermined age between five and seven and did not know her own age); *Beausoliel v. United States,* 71 App.D.C. 111, 107 F.2d 292 (1939) (six year old witness). *See generally* 2 Wigmore on Evidence § 505 & n.1 (3d ed. 1940) (citing cases). Moreover, as the trial court noted, the 14-month delay could easily have worked to appellant's advantage by causing the child's memory to fade. Appellant makes no claim that the presentation of his own evidence was in any way impaired. *See* note 15 *supra.*

■ Even if we assume, solely for the sake of argument, that appellant could meet the threshold burden of showing prejudice to his defense, the reasons for the 14-month delay do not justify relief under

---

**13.** The Court did so by agreeing with the government's concession that "the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial *and that the delay was an intentional device to gain tactical advantage over the accused.*" *Marion, supra,* at 324, 92 S.Ct. at 465 (emphasis added) (footnote omitted). The Court has declined to define other circumstances under which the actual prejudice caused by pre-arrest delay requires dismissal, but it has not ruled out the possibility that such other circumstances exist. *See Lovasco, supra,* 431 U.S. at 796–97, 97 S.Ct. at 2051–52; *Marion, supra,* 404 U.S. at 324–25, 92 S.Ct. at 465–66.

**14.** In *Lovasco, supra,* the Court noted that the government had expanded its "concession" that a "tactical" delay would violate due process by saying: " 'A due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense.' " *Id.* at 795 n.17, 97 S.Ct. at 2051 (quoting Brief for United States at 32–33 n.25).

**15.** The trial court rejected appellant's only claim of prejudice based on inaccessibility of witnesses. Appellant does not pursue that claim on appeal.

the Fifth Amendment.[16] We consider that period in two parts: (1) the eight months in California (March 1976 to December 1976), which covered appellant's trial, conviction, and imprisonment for an unrelated narcotics offense, and (2) the six months in the District of Columbia (December 1976 to June 1977), during which the police department and prosecutor were unaware that appellant was in the D.C. Jail.

As to the first, the trial court found that extradition proceedings (for parole revocation) began shortly after appellant's arrest in March 1976, but they were stalled when the California authorities refused to surrender appellant to the District until after he had been tried on a narcotics charge and had served his prison sentence. Thus the delay from March 1976 to December 1976 was not in reckless disregard of appellant's rights let alone designed to gain a tactical advantage for the government.[17] The second period, represented by the six-month breakdown of communications between the D.C. Department of Corrections and the police department, may be characterized as negligent, but it does not rise to the level of intentional or reckless government delay.

In summary, appellant has not demonstrated actual prejudice from pre-arrest delay. Nor has he shown intentional or reckless delay on the part of the government.

The trial court did not err in denying the motion to dismiss.

### III.

Appellant contends that the trial court applied an incorrect legal standard to reach its conclusion that Latita Simms was competent to testify and, in any event, that the trial court improperly denied defense counsel's request to cross-examine Latita Simms during *voir dire* as to competency.[18] Specifically, he argues that (1) the trial court considered only the child's ability to understand her obligation to testify truthfully, without regard to her ability to remember the events from the time period at issue, and that (2) once the prosecution was allowed to propound questions during *voir dire*, the defense also should have been allowed to do so.

A. In a pretrial motion, appellant asked the court for *voir dire* examinations of Latita Simms and Mark Wrice. The prosecutor joined in the request, called Latita Simms as the government's witness, and conducted *voir dire* out of the presence of the jury. The prosecutor's questions were designed primarily to ascertain Latita's capacity to understand "the difference between telling the truth and not telling the truth," and to obtain her "promise to tell Judge Campbell the truth" about everything she had seen and heard "back there in 1973."[19] The trial

---

**16.** It would be anomalous if a person who had been a fugitive for over two and one-half years could claim successfully that his due process rights had been violated by a 14-month pre-arrest delay. Appellant's own testimony shows he knew as early as 1974 that he was wanted for murder, yet he made no effort to turn himself in and even assumed an alias.

**17.** This does not necessarily mean that the full eight months in California can be entirely justified, for the District government might have been successful in obtaining appellant's presence earlier if it had argued that the District sought him on a murder charge rather than to face the parole revocation proceeding for which appellant was eventually returned to the District. We can only speculate, however, whether California officials would have acted differently in light of an additional charge.

**18.** Although appellant's brief appears to challenge the competency determination with respect to Mark Wrice as well as Latita Simms,

his arguments focus exclusively on Latita. Although we therefore need only address Latita's competency, we also conclude that the trial court did not abuse his discretion in ruling that Mark Wrice was competent to testify.

**19.** The prosecutor asked the following questions of Latita Simms on *voir dire*:

Q. This is Judge Campbell, and you know who I am, don't you?
A. (The witness nodded her head up and down.)
Q. And what's my name?
A. Mr. Hanny.
Q. O.K. Now, Latita; will you tell His Honor what your name is?
A. Latita.
Q. And what is your last name?
A. Simms.

 \* \* \* \* \* \*

Q. Now, Latita, how old are you right now?
A. Eight.

court then asked, "Do you remember way back in 1973?" She answered, "Yes." The court summarily denied defense counsel's request to conduct his own *voir dire* of Latita "as to what she remembers from 1973." The prosecutor then conducted the *voir dire* of Mark Wrice, after which the trial court overruled the defense motion to exclude the testimony of both children. At appellant's request following Latita's testimony at trial, the court reconsidered her competency and noted

> concern[ ] about whether this child understood that whatever it was that she was to tell both of you about, that she understood that she was to tell the truth as she understood it, as well as she could recall.

The court, once again, found her competent. Finally, in a post-trial memorandum, the court made specific findings and concluded that Latita had been competent to testify, stressing:

> ability to recollect, capacity for understanding right and wrong and the truth and a lie, [her] general intelligence, and powers of observation and communication.

Q. Do you know when your birthday is?
A. December 11th.
Q. O.K. Do you remember what year you were born?
A. No.
Q. O.K. And what grade are you?
A. Third.
Q. And can you tell us where you live, Latita? What street do you live at?
A. 230 Madison Street.
Q. 230 Madison Street?
A. (The witness nodded her head up and down.)
Q. Who do you live with?
A. My grandmother.
Q. What's your grandmother's name?
A. Miss Dean.
Q. Miss Dean. Now, Latita, do you remember all the times that you came up to my office with Lillian?
A. Yes.
Q. And we talked?
A. Yes.
Q. And do you remember me asking you, Latita, do you know the difference between telling the truth and not telling the truth?
A. Yes.
Q. Do you remember that?
A. Yes.
Q. And, honey, do you know the difference between telling the truth and not telling the truth?

The determination of a child's competency to testify is a threshold question of law committed to the sound discretion of the trial court. *E. g., Wheeler, supra,* 159 U.S. at 524–25, 16 S.Ct. at 93–94; *Brown v. United States,* D.C.App., 388 A.2d 451, 458 (1978); *Doran v. United States,* 92 U.S.App.D.C. 305, 307, 205 F.2d 717, 718, *cert. denied,* 346 U.S. 828, 74 S.Ct. 49, 98 L.Ed. 352 (1953). The proper legal standard encompasses (1) the child's intellectual capacity to understand the difference between truth and falsehood, coupled with appreciation of the duty to tell the truth, *Johnson v. United States,* D.C.App., 364 A.2d 1198, 1202 (1976); *accord, In re Lewis,* D.C.Mun.App., 88 A.2d 582, 583 (1952); *United States v. Schoefield,* 150 U.S.App. D.C. 380, 382, 465 F.2d 560, 562, *cert. denied,* 409 U.S. 881, 93 S.Ct. 210, 34 L.Ed.2d 136 (1972), and (2) " 'the child's ability to recollect the events about which she was to testify.' " *Johnson, supra* at 1203 (quoting *Edmondson v. United States,* D.C.App., 346 A.2d 515, 516 (1975).[20]

The court's discretion embraces not only the ultimate determination but

A. Yes.
Q. Did you learn in school that to tell the truth is good and to not tell the truth, to lie, is not a good thing to do, it's a bad thing?
A. Yes.
Q. And, Latita, do you know the difference between right, doing something right and doing something wrong?
A. Yes.
Q. And do you promise to tell Judge Campbell the truth and everything that you saw, everything that you heard back there in 1973?
A. Yes.

20. The trial judge gave the following cautionary instruction regarding the children's testimony, which reflects these criteria:

> With respect to a child's testimony, there were two children who testified, as you may well know in this case.
> A child is not disqualified as a witness merely by reason of his or her youth. There is no precise age which determines the competency of a child to testify. This depends on the capacity and intelligence of the child, his or her understanding of the difference between truth and falsehood, and his or her appreciation of his or her duty to tell the truth.
> Children are likely to be more suggestible than adults. Moreover, children may not

also the method of examination selected for appraising competency. *Schoefield, supra,* 150 U.S.App.D.C. at 382, 465 F.2d at 562. *Accord, Doran, supra,* 92 U.S.App.D.C. at 307, 205 F.2d at 719. Thus, the court may conduct *voir dire* itself, without participation by counsel, *see, e. g., United States v. Spoonhunter,* 476 F.2d 1050, 1055 (10th Cir. 1973), and, in its discretion, may do so in the presence of the jury, rather than as a pretrial matter. *Brown, supra* at 458; *Johnson, supra* at 1200 n.1. In fact, the trial court's decision as to competency will be sustained even when it proceeds without a *voir dire* where the "transcript reveals intelligible comprehension [by the witness] in terms of answering the questions that were asked," *Schoefield, supra,* 150 U.S.App.D.C. at 382, 465 F.2d at 562. Accordingly, in view of this latitude, justified substantially by the trial court's opportunity to observe the witness' demeanor, we will not disturb the court's decision unless it is clearly erroneous. *Johnson, supra* at 1202 (citing cases); *Schoefield, supra,* 150 U.S.App.D.C. at 382, 465 F.2d at 562.

 We conclude, first, that the trial court applied the proper legal standard for ascertaining competency. It is true, as appellant contends, that *voir dire* focused almost exclusively on the first criterion: Latita Simms' capacity to understand the difference between truth and falsehood and her appreciation of the duty to tell the truth. Nonetheless the court's own ques-

tion at *voir dire* as to her ability to "remember way back in 1973," followed by the court's observations and findings immediately after Latita's testimony at trial—and again in the post-trial Order—clearly covered the second criterion: ability to recollect the events about which she testified.[21]

 B. We agree, however, with appellant's other contention: that the trial court improperly denied defense counsel the opportunity to cross-examine Latita Simms during *voir dire.* Although the court has discretion to conduct *voir dire* in an inquisitional manner, without the help of counsel, *see Spoonhunter, supra,* it decided here to enlist the assistance of counsel, implying an election to proceed in an adversarial manner. By allowing the prosecution but not the defense to participate in *voir dire,* the court violated its own implied rules of procedure. Consequently, instead of assuring a thorough, well-balanced inquiry—which the court itself conducting *voir dire* could have accomplished—the court permitted one party to slant *voir dire* toward its own useful perspective, such that the balance inherent in either an inquisitional or an adversarial proceeding (with all parties participating) could not have been achieved.

The course of *voir dire* itself reveals the imbalance likely to occur in the absence of cross-examination. The prosecutor limited his questions to the first competency criterion (Latita Simms' ability and willingness to

---

have a full understanding of the serious consequences of the testimony that they give. You should, therefore, consider the capacity of the child witness to distinguish truth from falsehood and to appreciate the seriousness of his or her testimony in evaluating that testimony.

As in the case of all other witnesses, you are the sole judges of the credibility of the children who have testified in this case. In weighing their testimony, you may consider not only their age, but their demeanor on the witness stand; their capacity to observe facts; their capacity to recollect them; their ability to understand the questions put to them and to answer those questions intelligently; whether they impress you as having an accurate memory and recollection; whether they impress you as being truth-telling children or truth-telling individuals; and any other facts and circumstances bearing on

their credibility. You should give the testimony of the children who have testified before you in this case such weight as in your judgment you feel that it is fairly entitled to receive.

This instruction closely follows *Criminal Jury Instructions for the District of Columbia,* No. 2.21 (3d ed. 1978).

21. On appeal, this court may consider the actual testimony of the child at trial in reviewing and evaluating the court's exercise of discretion. *E. g., Johnson, supra* at 1203; *Edmondson, supra* at 516 n.1. Even assuming, therefore, that the trial court failed at *voir dire* or thereafter to articulate sufficient reasons for determining that Latita was competent to testify, we conclude that the trial transcript supports that determination.

ascertain and speak the truth), *see* note 19 *supra*, making all the more compelling defense counsel's request to ask questions covering the second criterion ("what she remembers from 1973").

We have underscored the constitutional significance of cross-examination:

> It is axiomatic that the Sixth Amendment guarantees to a defendant in a criminal prosecution the right " 'to be confronted with the witnesses against him.' " *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) [quoting U.S.Const. amend. VI]. Central to the fundamental right of confrontation and to the conduct of an effective defense is the opportunity to cross-examine government witnesses against the defendant. *Id.* at 315–16, 94 S.Ct. 1105. [*Springer v. United States*, D.C. App., 388 A.2d 846, 854 (1978).]

Here, the trial court denied appellant the fundamental right to cross-examine a government witness whom the government itself had examined during the critical stage when the very competency of that witness—determining the government's right to bring that witness before the jury—was at issue. In so doing, the trial court deprived appellant of his Fifth Amendment right to due process.

It is no answer to say that defense counsel's opportunity to cross-examine the witness at trial, in front of the jury, cured any possible constitutional infirmity.[22] Without having an opportunity, through cross-examination, to challenge the government's effort to demonstrate competency during *voir dire*, defense counsel was forced to choose, at trial, between pressing Latita Simms about her capacity to tell the truth and to recall events in 1973 (as he would have during *voir dire*) and taking a less severe approach toward her in front of the jury (the course he chose at trial). This was fundamentally unfair, since it put the defense in a position of having to risk jury hostility in order to ask the kinds of questions commonly used to ferret out a child's inability to perceive or tell the truth, or to recall long past events.

Having found constitutional error, we conclude, nonetheless, that it was harmless. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). On this record, the jury, beyond a reasonable doubt, would have convicted appellant even if Latita Simms (and Mark Wrice) had not testified. *See Springer, supra* at 856. Of most compelling significance, the jurors not only heard Theresa Martin testify that appellant told her "he had killed a girl up in Washington," but they also heard former Officer Crabtree discuss appellant's confession to murdering his "old lady"—whom appellant named as Regina Simms—in the District of Columbia. Furthermore, an examination of Latita Simms' *voir dire* and trial testimony, *see* note 21 *supra*, convinces us, beyond a reasonable doubt, that even if defense counsel had conducted *voir dire* about her ability to recall events in 1973, that " 'would not have weakened the impact of the witness' testimony' " to the point of casting doubt on her competency. *Id.* (citation omitted). The trial court's findings and conclusions as to Latita Simms' competency, therefore, should not be disturbed.[23]

## IV.

In summary, we conclude that the trial court correctly denied appellant's motion to

---

22. *Compare Jackson v. Beto*, 388 F.2d 409, 411 (5th Cir.) *vacated on other grounds*, 392 U.S. 649, 88 S.Ct. 2290, 20 L.Ed.2d 1350 (1968), *appeal after remand*, 428 F.2d 1054 (5th Cir. 1970), *vacated in part*, 408 U.S. 937, 92 S.Ct. 2866, 33 L.Ed.2d 757 (1972) (inquisitional *voir dire* by court alone during *in camera* interview was not constitutional error since defense counsel had opportunity to cross-examine witness at trial).

23. Appellant also maintains that it was error for the trial court to advise, during *voir dire* of the jury panel, that the law treats minor children "with special privilege." The trial court did not err in doing so. It was determining whether any potential juror believed a minor child's testimony was entitled to less credibility than an adult's. The trial court did not instruct the jury as to any "special privilege" but gave essentially the standard instruction on considering the testimony of a child. *See* note 20 *supra*.

dismiss on due process and speedy trial grounds. We also conclude that, although the trial court committed constitutional error in denying defense counsel the right to cross-examination after the government had examined its witness during a pretrial *voir dire* as to competency, that error was harmless beyond a reasonable doubt. Accordingly, we affirm appellant's convictions.

## V.

 On May 21, 1979, the United States Attorney wrote to the Chief Judge of the Superior Court and to appellant's counsel, pointing out that the length of sentence imposed on appellant for unlawful possession of a pistol, D.C.Code 1973, § 22–3203, was unauthorized because appellant had not previously been convicted under that section. Our review of the record in this court and in the Superior Court discloses that no motion to correct illegal sentence has been filed, pending resolution of this appeal.[24] *See* D.C.Code 1973, § 23–110; Super.Ct. Cr.R. 35(a). In view of the government's letter, however, we remand the case to the trial court for further proceedings to correct the sentence. *See King v. United States*, D.C.App., 271 A.2d 556, 559 & n.8 (1971) (trial judge has jurisdiction to consider illegality of sentence upon receipt of mandate from this court).

*So ordered.*

KERN, Associate Judge, concurring:

While I agree that the trial court erred in refusing to permit defense counsel during *voir dire* to question Latita Simms on her ability to recall events, I do not agree that its error deprived appellant of his Fifth Amendment right to due process in light of the opportunity afforded defense counsel at trial to examine the witness' competency and the trial court's determination again at this point that she was competent.

It is obvious that the court, by permitting one counsel but not the other to propound questions at the *voir dire* of the witness, erroneously exercised the discretion it has

in the method of examining witnesses to determine their competency. However, as the court's opinion convincingly demonstrates, the trial court's error in the exercise of its discretion was not so severe as to require reversal. *See Johnson v. United States*, D.C.App., 398 A.2d 354, 366 (1979).

NEWMAN, Chief Judge, concurring:

I join fully the opinion of the court. However, in light of the concurrence of Judge Kern, I add the following comments. In *Johnson v. United States*, D.C.App., 398 A.2d 354 (1979), this court discussed at length the doctrine of judicial discretion and appellate review thereof. One central thesis of that opinion was that in exercising discretion, the trial judge must be guided by legal criteria and principles. *Id.* at 365, citing among other authorities, *Brown v. Allen*, 344 U.S. 443, 496, 73 S.Ct. 397, 441, 97 L.Ed. 469 (1953). Likewise, in reviewing the trial judge's exercise of discretion, the appellate court is constrained by similar legal criteria and principles. This constraint is mandated to avoid appellate review of the trial court's exercise of discretion by what has been referred to as "a form of ill-tempered appellate grunting. . . ." Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 Syracuse L.Rev. 635, 639 (1971). The opinion of our concurring colleague, I submit, demonstrates a failure to observe this constraint. It points to no rule of law, legal principle or criteria which the trial judge erroneously applied in making the choice he did. To nonetheless say that the trial court abused its discretion, without pointing to the rule of law, legal principle, or criteria the court erroneously applied, appears to be an improper manner to review the trial court's exercise of discretion.

---

**24.** The Superior Court file contains correspondence between Judge Burka's chambers and appellant's counsel indicating that counsel planned to file such a motion.