**In re A.H.B., Appellant.**

No. 84–538.

District of Columbia Court of Appeals.
Submitted Feb. 25, 1985.
Decided April 10, 1985.

Adult Offenders Act inapplicable to D.C. of- fenses).

Kenneth H. Rosenau, Washington, D.C., appointed by this court, was on brief, for appellant.

Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Michele Giuliani, Asst. Corp. Counsel, Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and TERRY and ROGERS, Associate Judges.

TERRY, Associate Judge:

Appellant, a juvenile, was adjudicated delinquent on a charge of robbery, in violation of D.C. Code § 22–2901 (1981).[1] The government's case in chief consisted entirely of the testimony of two children, Anton and Crystal Wormley, who were eleven and eight years old, respectively, at the time of trial. Appellant challenges the trial court's determination that these children were competent witnesses. We find no merit in his challenge and affirm the adjudication of delinquency.

I

One afternoon in February 1984, Anton and Crystal Wormley were sent by their mother to the grocery store to buy a few small items. As they approached the store, they encountered two teenaged boys, J.M.H. and A.H.B. Although Anton knew only J.M.H. by name, he recognized A.H.B. from having seen him in the neighborhood. A.H.B. confronted Anton outside the store and said, "Give me some money." Anton refused, and he and his sister went inside to make their purchases. A.H.B. followed him into the store, and at the checkout counter he again asked Anton for money.

1. He was acquitted on a companion charge of assault with a dangerous weapon.

Again Anton refused. After paying for the groceries, Anton put his change, which included about $9.00 worth of food stamps, into his back pocket. As he and his sister left the store, A.H.B. demanded money a third time, but Anton still refused to give him any.

When Anton and his sister started walking home, J.M.H. stepped in front of them and asked if Anton knew him. Just at that moment Anton felt a hand in his back pocket grab the remaining food stamps. According to Anton, A.H.B. was the one who took the stamps,[2] but he quickly handed them to J.M.H. Then J.M.H. yelled "run," and the two boys ran away.

Anton immediately called his mother from a nearby pay phone and told her what had happened. Then, after sending Crystal home, he decided to pursue the boys himself. As he ran after them, A.H.B. threw a brick at him. At another point, when Anton caught sight of his quarry on the opposite side of a small creek, he and the two boys threw a few rocks at each other, and J.M.H. threatened to throw him into the creek. Finally Anton found a police officer, and together they continued the search in the officer's scout car. Eventually they found A.H.B. hiding behind a car, and he surrendered to the officer.

Crystal Wormley testified that, while she did not actually see A.H.B.'s hand reach into her brother's back pocket, she did see A.H.B. hand the food stamps over to J.M.H. "about five seconds" later. Her testimony generally corroborated that of Anton, except as to who yelled "run" and some other inconsistencies which we shall discuss in part IV of this opinion.

A.H.B. testified that J.M.H. was the one who took the food stamps. He admitted, however, that he had asked Anton for money and had followed him into the store.

## II

■ A child witness must satisfy two requirements in order to be found compe-

tent. First, the child must be able to recall the events about which he or she is to testify. *See Edmondson v. United States,* 346 A.2d 515, 516 (D.C.1975) (seven-year-old girl allowed to testify in rape trial). Second, the child must have the "intellectual capacity to understand the difference between truth and falsehood, coupled with appreciation of the duty to tell the truth ...." *Smith v. United States,* 414 A.2d 1189, 1197 (D.C.1980) (citations omitted) (eight-year-old girl found competent to testify about a murder that occurred when she was only three and a half). The trial court may examine the child in several ways to see if he or she meets these requirements. For example, it may conduct a *voir dire* of the child with or without the participation of counsel, either in the presence or in the absence of the jury (if there is one), during or before trial. Even if the trial court finds the child competent without a *voir dire,* that finding will not be reversed on appeal if "[t]he transcript reveals intelligible comprehension in terms of answering the questions that were asked." *United States v. Schoefield,* 150 U.S.App.D.C. 380, 382, 465 F.2d 560, 562, *cert. denied,* 409 U.S. 881, 93 S.Ct. 210, 34 L.Ed.2d 136 (1972) (twelve-year-old held competent to testify as a victim of assault with intent to commit carnal knowledge). The determination of a child's competency to testify is committed to the sound discretion of the trial court. Only when the record demonstrates clear error will its ruling be overturned. *Wheeler v. United States,* 159 U.S. 523, 524–25, 16 S.Ct. 93, 93–94, 40 L.Ed. 244 (1895); *Smith v. United States, supra,* 414 A.2d at 1197–1198.

■ Appellant does not contend that Crystal failed to meet the first requirement of demonstrating an ability to remember the events of the robbery. But he does argue that Anton's "capacity for remembering and relating the facts ... must be questioned." Appellant refers in particular

---

**2.** At an earlier probable cause hearing, Officer David Gledhill testified that Anton had told him

that J.M.H. was the one who had "taken the property from him."

to the apparently contradictory statements made by Anton with regard to who actually "took" the food stamps. At the probable cause hearing, Officer Gledhill testified that Anton identified J.M.H. as the one who took the food stamps; at trial, however, Anton testified that A.H.B. grabbed the food stamps from his back pocket. These statements do not necessarily reflect a contradiction, but only an elastic use of the word "took." A.H.B. was the only one behind Anton, and thus he must have been the one who removed the food stamps from Anton's pocket. But Anton saw A.H.B. hand them to J.M.H. almost immediately, just before A.H.B. and J.M.H. ran off together. Thus each of them "took" the food stamps: A.H.B. took them from Anton, and J.M.H. took them from A.H.B. We find no inconsistency here; at worst, there was an ambiguity which the trial court was at liberty to resolve in the government's favor.[3] Read in its entirety, Anton's rather lengthy testimony demonstrates that he could adequately recall the events surrounding the robbery.

### III

Appellant argues next that neither Anton nor Crystal showed that they appreciated the difference between truth and falsehood or understood their duty to tell the truth. The record refutes appellant's argument.

Crystal and Anton had to undergo a fairly intense *voir dire* in which both counsel and the trial judge participated.[4] As a result of the latitude that appellant's counsel was afforded on the *voir dire* of Anton (for which counsel even thanked the court),

some of Anton's responses do seem to suggest that he did not fully understand the difference between a lie and the truth. For example, after Anton said that he knew the difference, he explained that "[a] lie is when you get in trouble and the truth is when—sometimes you get in trouble." Anton also believed that if he "stretched" the truth, he would not be violating his oath. The record as a whole, however, makes clear that he understood the difference between truth and falsehood well enough to testify. When Anton was given examples of a lie and a truth, he could easily differentiate between the two:

Q. ... If I were to say that I'm wearing a red jacket, would that be a lie or would that be the truth?

A. A lie.

Q. And why would it be a lie?

A. Because you're wearing a brown jacket.

Q. Okay. If I were to say that I'm wearing a tan shirt, would that be a lie or would that be the truth?

A. The truth.

Q. And why?

A. Because you're wearing a tan shirt.

In addition, Anton later told the court that he would not stretch the truth, and that he would describe the events just as they occurred.

▉ Appellant also contends that Anton felt no duty to tell the truth because his parents were not in the courtroom; if they did not find out he had told a lie, he said, he would not "get in trouble." But

---

**3.** Contrary to appellant's contention, Anton never specifically told Officer Gledhill that J.M.H. was the one who reached into his back pocket. Rather, Anton told both Officer Gledhill and the court that A.H.B. was behind him at the time of the theft, which was the only position from which the stamps could have been taken. Anton consistently testified at trial that it was appellant who removed the food stamps from his pocket.

**4.** The *voir dire* in this case was far more rigorous than, for example, the one set forth in

*Smith v. United States, supra,* 414 A.2d at 1196 n. 19, in which the child witness merely answered "yes" to a series of questions. We did not specifically rule in *Smith* that this type of *voir dire* qualified the witness as someone who knew the difference between truth and falsehood and understood the duty to tell the truth. But we did uphold the trial court's determination that the witness was competent to testify. Our review of the records in many cases has shown us that such a *voir dire* is not uncommon.

Anton later acknowledged that he could be punished by the judge for lying:

Q. So you can say pretty much anything and not really worry about being punished, right?

A. Hm-hm. Yes.

Q. You're not going to be punished by your mother, and you're not going to be punished by your father, you're not going to be punished by me. Did you ever meet me before? You're not going to be punished by her [the prosecutor], you're not going to be punished by him, the Judge?

A. Hm-hm, I might.

Q. You might? Why?

A. If I lie, I will.

Q. How is he going to know if you're lying? What can the Judge do to you?

A. Hm-hm.

Q. When did you find out the Judge might punish you?

A. She [the prosecutor] told me.

Q. When did she tell you that?

A. When I was in her office.

Q. And what do you think the Judge can do to you?

A. Put me in a home ....

Q. And why would he do that?

A. If I lie, he will.

Courts have recognized that a child's fear of punishment satisfies the "duty" requirement. *E.g., Posey v. United States*, 41 A.2d 300, 301 (D.C.1945). In this case Anton was afraid of being put in "a home." [5] This stated fear was sufficient to support the trial judge's finding that Anton felt a duty to tell the truth.

■ Similarly, Crystal demonstrated that she understood the difference between truth and falsehood, and her duty to tell the truth. Admittedly, Crystal said at one point that the exaggeration "I told you a thousand times" was still the truth. But she later demonstrated that she would not distort the truth to the point of "making up a story":

Q. So if somebody was three feet away and you said he was ten feet away, that's still the truth, right?

A. No, that's a lie.

Q. Why is that a lie?

A. Because he was not three feet away, he's ten feet away.

Q. Suppose he was three feet away and you said he was four feet away?

A. That's a lie too.

Q. That's a lie?

A. Yes.

Q. Suppose you're just not sure, suppose you said I think it's three feet. Is that the truth?

A. No, you're telling a story because you don't really know how many feet he is away.

Q. And you're not supposed to tell any stories here, right?

A. No.

After some questioning by opposing counsel, the trial judge continued:

THE COURT: And what are you going to tell us, what you saw or what mama saw?

THE WITNESS: What I saw.

\* \* \* \* \* \*

THE COURT: And only what you saw.

THE WITNESS: Yes.

THE COURT: Only what you saw, nothing else.

THE WITNESS: Yes.

THE COURT: Nothing else.

THE WITNESS: Yes.

Finally, the record makes clear that Crystal felt both a moral and legal duty to tell the truth. She remarked that she could "go to jail" or "go to the devil" for lying in

---

**5.** Anton did agree with appellant's counsel that no punishment would result from just "stretching things a little ...." This statement, however, does not warrant reversal, since Anton twice told the trial judge that he would not stretch the truth. In any event, "stretching" is probably a matter of credibility rather than competency. *See also* C. McCormick, Evidence § 62 (3d ed. 1984) ("the remedy of excluding ... a [child] witness, who may be the only person available who knows the facts, seems inept and primitive").

court. Although Crystal conceded to appellant's counsel that the judge would not find out about a lie unless she confessed it, the moral obligation was still present. Such a sense of moral responsibility alone is sufficient to establish an awareness of the duty to be truthful. *Beausoliel v. United States*, 71 App.D.C. 111, 113, 107 F.2d 292, 294 (1939). On this record we conclude that the trial judge properly allowed Crystal to testify.

Appellant refers us to *United States v. Crosby*, 149 U.S.App.D.C. 306, 462 F.2d 1201 (1972), in which the court held that "the competency standard for witnesses may vary depending on the importance of the witness to the case. Where, as here, the witness is the *key* witness for the prosecution, justice demands a strict standard of competency." *Id.* at 308, 462 F.2d at 1203 (emphasis in original). The key witness in *Crosby* was a drug addict who had even taken drugs during the trial. His drug addiction thus became a " 'red flag' of material impact on competency . . . ." *Id.* The trial court, however, refused to examine the witness' medical records. The Court of Appeals held that this refusal constituted reversible error.

■ The *Crosby* holding is not binding on this court,[6] and we have never decided whether to follow it. But even if it were binding, appellant's reliance on it would be misplaced. *Crosby* requires only that the trial court further investigate a witness' competency if some fact comes to the court's attention that could be characterized as a "red flag." No such flag flew in this case. Even though Anton, and possibly Crystal as well, were key witnesses, the record reveals at most some inconsistencies in their testimony of the sort that can be found in almost any trial. There was nothing before the trial court that would warrant application of the "strict standard" of *Crosby*.

**IV**

■ Appellant argues that the testimony of Anton and Crystal was totally incredible, and therefore insufficient to sustain a verdict of guilty. He points out several inconsistencies between the two children's testimony: differences as to "who paid for the groceries and how . . ., which boy yelled 'run' . . ., and how Anton called his mother after the incident . . . ." Such inconsistencies, however, do not require the testimony to be entirely discredited; rather, the presence of inconsistencies between the testimony of two witnesses is "simply a factor to be considered" by the trier of fact. *Coates v. United States*, 134 U.S. App.D.C. 97, 99, 413 F.2d 371, 373 (1969).

Appellant notes that the testimony of each child had internal inconsistencies as well. Anton's testimony changed during the trial with respect to the amount of money he had left after going to the store, how he happened to know A.H.B., the type of change he used to call his mother, and the height of J.M.H. Crystal misstated that J.M.H. followed Anton around the store (although she corrected herself in her next answer), and at one point she said that the "big boy" named J.M.H. ran up the hill.[7] Crystal also had to correct herself and pause when answering whether or not she saw who took the food stamps from her brother's pocket; she concluded emphatically, however, that A.H.B. took the stamps, basing her conclusion on the fact that she saw A.H.B. with the stamps in his hand immediately after the theft.

■ A certain amount of inconsistency in the evidence is almost inevitable in any trial, but it rarely justifies reversal. *See United States v. Gutman*, 725 F.2d 417, 421 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 244, 83 L.Ed.2d 183 (1984) (no "abnormal degree of internal inconsistency" found in witness' testimony); *United States v. Jackson*, 579 F.2d 553, 558 (10th Cir.), *cert. denied*, 439 U.S. 981, 99 S.Ct.

---

6. *See M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971).

7. A.H.B. was consistently referred to as the "big boy" during the trial.

569, 58 L.Ed.2d 652 (1978) ("[e]vidence is not necessarily insufficient merely because the witness' testimony has been contradictory and the explanations therefor difficult of belief" (citation omitted)); *United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir.1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970) ("[a] witness may be inaccurate, contradictory and even untruthful in some respects and yet be entirely credible in the essentials of his testimony"). The testimony of the two children in this case falls far short of being "inherently incredible," as that term is used in *Jackson v. United States*, 122 U.S.App.D.C. 324, 329, 353 F.2d 862, 867 (1965).[8] The inconsistencies and contradictions in their testimony generally involved collateral details; on the main events of the robbery they were almost always in full agreement. Moreover, Crystal's testimony corroborated that of Anton in several particulars.

 "In assessing the sufficiency of the evidence, we are required to give the government the benefit of all reasonable inferences," and an adjudication of delinquency "will not be reversed as long as there is evidence which reasonably permits a finding of guilt." *In re E.G.C.*, 373 A.2d 903, 906 (D.C.1977) (citations omitted). The trial court inferred that since A.H.B.—and not J.M.H.—was in the store with Anton, A.H.B. alone would know which pocket contained the food stamps. In addition, J.M.H. was in front of Anton when the stamps were stolen (A.H.B. even testified to this); A.H.B., who was standing either beside or behind Anton, was therefore the only one in a position to take the stamps from his back pocket. Both Crystal and Anton testified that immediately after the food stamps were taken, A.H.B. handed

them over to J.M.H. On the basis of this and other evidence, the trial court properly found that A.H.B. had committed a robbery. We find no error.

*Affirmed.*

---

**8.** The doctrine of inherent incredibility can be invoked only when the testimony can be "disprove[d] ... as a matter of logic by the uncontradicted facts or by scientific evidence," or when "the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave." *Jackson, supra,* 122 U.S.App.D.C. at 329, 353 F.2d at 867 (footnotes omitted). This is a very stringent test which has been met in only a tiny number of cases, of which the twenty-year-old *Jackson* case is one of the most recent.