Ernest HAMMON, Eric Porter, and Ronald Gray, Appellants,

v.

UNITED STATES, Appellee.

Nos. 93–CF–316, 93–CF–321 and 93–CF–388.

District of Columbia Court of Appeals.

Argued March 19, 1997.

Decided May 15, 1997.

---

Gregory C. Powell, appointed by the court, Centreville, MD, filed an appearance, for appellant Hammon and adopted the arguments of appellants Porter and Gray.

Richard Todd Hunter, appointed by the court, for appellant Porter.

William T. Morrison, appointed by the court, for appellant Gray.

Rachel Adelman–Pierson, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN and STEADMAN, Associate Judges, and PRYOR, Senior Judge.

FERREN, Associate Judge:

On December 18, 1992, after a jury trial, Ernest "June" Hammon, Eric Porter, and Ronald Gray were convicted of aiding and abetting the involuntary manslaughter[1] of Charles "Dino" Fisher.[2] They argue on appeal that the trial court erred by declining to conduct an in camera inspection of "treatment center" records from Florida pertaining to the competency of a government juvenile witness; by failing to scrutinize District of Columbia and Florida records of the same

witness for *Brady*[3] and Jencks Act[4] violations; and by giving the jury an improper instruction on aiding and abetting. Appellants also argue that the evidence to support their convictions was insufficient for two reasons: there was inadequate proof of the proximate cause of Fisher's death, and the government failed to prove the existence of a principal—a required predicate for aiding and abetting. We affirm.

### I.

At trial, the government's evidence showed that Charles Fisher died as a result of wounds from a fight with a number of individuals. In the course of the fight, Fisher fell and hit his head on concrete steps. The Chief Medical Examiner for the District testified that Fisher died of blunt head trauma consistent with either a blow or a fall.

The police arrested several individuals in connection with Fisher's death, including appellants and a minor, A.W.[5] A.W. agreed to plead guilty to the second degree murder of Fisher in exchange for dismissal of a murder charge in another case. As a result of his plea, A.W. was sent to a treatment center in Florida.

When appellants' trial began, questions remained as to whether the government or any of the appellants would call A.W. as a witness. As a precaution, citing the Jencks Act, appellants asked for (but did not receive) the transcript of A.W.'s juvenile disposition hearing.[6] The government said it was having difficulty obtaining A.W. from Florida and ultimately told appellants and the court that, because it would take two weeks to arrange for A.W.'s appearance in court, the government would not call him as a witness. The trial court then ruled that although A.W. was

---

**1.** D.C.Code § 22–2405 (1996 Repl.).

**2.** Appellants were sentenced to prison for the following terms, respectively: Hammon, 30 to 90 months, Porter, 40 to 120 months; and Gray, 24 to 72 months.

**3.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**4.** 18 U.S.C. § 3500 (1994).

**5.** The grand jury indicted not only appellants but also Keith Mitchell and Calvin Gaither, who were tried with Hammon, Gray and Porter. Judge Abrecht granted Mitchell's motion for judgment of acquittal, and the jury acquitted Gaither.

**6.** As elaborated below, the trial judge ultimately determined that the transcript was exempt from the Jencks Act, 18 U.S.C. § 3500 (1994), but she also assured defendants that, in any event, there was no Jencks material in the transcript.

available, his presence had not been requested and thus his statement at his disposition hearing could not be introduced as testimony of an unavailable witness.

The government presented several witnesses. Michael Glover testified that appellants Porter and Gray had been present at the crime scene. Detective Jeffery Mayberry of the Metropolitan Police Department (MPD) confirmed that Glover had identified Gray and Porter from a photo array before trial. MPD Officer Christopher Leary, who found Fisher's body, testified that he had seen Gray leaving the scene as he arrived. Tyrone Gathers testified that he had seen Gray, Porter, and "Fishbone" (an alias of A.W.) fighting with Fisher when Fisher fell and hit his head on the stairs. The government called Tandra Vaugn, who claimed she could not remember any of the events that had taken place but confirmed that she had identified Hammon, Porter, and Gray to the grand jury as present at the scene. The government also called the District's Chief Medical Examiner, who testified as to the cause of death.

The government then changed its mind about calling A.W. It asked for a continuance for the specific purpose of obtaining A.W. and presenting his testimony. Appellants protested. In addition to arguing unfair surprise, they proffered that A.W. was in an "insane asylum" in Florida,[7] that lawyers familiar with A.W. had "indicated he suffers from a psychiatric disorder," and that a police detective, Fox, involved in investigating A.W. had told defense counsel that A.W. was implicated in several murders.[8] Appellants accordingly asked the court to conduct an in camera review of A.W.'s juvenile files from both the District and Florida to determine their possible bearing on A.W.'s competency to testify, as well as to ascertain whether they contained Jencks and *Brady* material. Appellants also asked the court to hold a hearing to determine whether A.W. was competent to testify. The trial judge agreed to a continuance so that the government could bring A.W. to the District. The judge also agreed, during the interim, to review in camera the District's files on A.W.[9]

At a hearing to resolve issues pertaining to A.W., Judge Abrecht announced that she had conducted a "preliminary review" of the District's records on A.W. and found no "red flag" to suggest that A.W. was incompetent to testify. She therefore declined to subpoena A.W.'s Florida records, ruling that the defense proffer simply did not raise a competency issue in light of the information contained in the District's records. Two days later, Judge Abrecht announced she had done a "complete review" of the District's records on A.W. and confirmed her previous ruling. She also ruled that the records were not subject to the Jencks Act and *Brady:*

[T]he Government in this case is the U.S. Government, [which], under the case law,

---

7. When defendants first raised the allegation that A.W. was in an "insane asylum," the government replied that A.W. was at a "treatment center" but refused to divulge any further information.

8. During trial, Mitchell also filed a written ex parte motion to compel production of A.W.'s medical, psychiatric, psychological, counseling, therapy, and other treatment records from any government institution. Gray later joined in the motion, which included a proffer only slightly more detailed than the one at trial.

9. It is unclear from the record precisely what A.W. files there were in the District. The trial judge referred generically to A.W.'s "juvenile files." The District keeps two sorts of files on juveniles adjudicated delinquent: Juvenile Case Records, *see* D.C.Code § 16–2331 (1989 Repl. & Supp.1996) ("case files"), and Juvenile Social

Records, *see* D.C.Code § 16–2332 (1989 Repl.) ("social files"). Case files contain: "(1) Notices filed with the court by an arresting officer pursuant to this subchapter. (2) The docket of the court and entries therein. (3) Complaints, petitions, and other legal papers filed in the case. (4) Transcripts of proceedings before the court. (5) Findings, verdicts, judgments, orders, and decrees. (6) Other writings filed in proceedings before the court, other than social records." D.C.Code § 16–2331(a). Social files contain: "all social records made with respect to a child in any proceeding over which the [Family] Division has jurisdiction under section 11–1101(13), including preliminary inquiries, predisposition studies, and examination reports." D.C.Code § 16–2332(a). These code provisions make clear that both sets of files are accessible to the Superior Court. *See* D.C.Code §§ 16–2331(b)(1), – 2332(b)(1).

as I read it, specifically *Frye* [10] and *C[o]llins*,[11] is not obligated to obtain and turn over information from the Juvenile Social files or from juvenile institutions, under either Jencks or *Brady*, because those materials are not in the possession of the Government, and they need not go through any hoops to obtain possession, to be able to then have them for *Brady* or Jencks purposes.

So, I do not see any basis under Jencks or *Brady*, to be looking at anything contained in them on *Brady* or Jencks grounds.

When trial resumed, A.W. testified that he had been involved in the fight with Fisher when Fisher fell and hit his head. He positively identified Hammon, Porter, and Gray as participants. The government also brought out A.W.'s plea to second degree murder at his disposition hearing, as well as his current status as a resident of a "treatment center" in Florida. Defense attorneys then cross-examined A.W. about his drinking and possible drug use at the time the events took place and also questioned him about his plea bargain. But none of the defense attorneys cross-examined A.W. about medical or mental health treatment he may have received or about the nature of the "treatment center" in Florida. In closing argument, the defense stressed A.W.'s alcohol use and his plea bargain as points against A.W.'s credibility and attempted to shift the blame for Fisher's death entirely onto A.W.

Among others, Judge Abrecht gave the jury the following "aiding and abetting" instruction:

> The government has proceeded on an aiding and abetting theory. You may find a defendant guilty of a crime without finding that he personally committed each of the acts that make up the crime. Any person who in some way intentionally participates in the commission of the crime aids and abets the principal offender. He, therefore, is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime.

To find that a Defendant aided and abetted in committing a crime you must find that the Defendant knowingly associated himself with the person or persons who committed the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed. Some affirmative conduct by a Defendant to help in planning or carrying out the crime is necessary. Mere physical presence by a Defendant at the place and time of the crime is committed is not by itself sufficient to establish his guilt. However, mere physical presence is enough if it is intended to help the principal offender and, in fact, does help him.

The Government is not required to prove that anyone discussed or agreed upon a specific time or method of committing the crime, nor need the Government prove that the principal offender and the person alleged to be the aider and abetter directly communicated with each other. *It is not necessary that the Defendant have had the same intent that the principal offender had when the crime was committed or that he intended to commit the particular crime committed by the principal offender.*

*An aider and abetter is legally responsible for the acts of other persons that are the natural and probable consequences of the crime in which he intentionally participates.* It is not necessary that all the people who committed the crime be caught or identified. It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the Defendant knowingly and intentionally aided and abetted the principal offenders in committing the crime.

(Emphasis added.)

The defense objected to the italicized language on the ground that it varied impermissibly from the standard instruction in the Standardized Criminal Jury Instructions for the District of Columbia, No. 4.02 (3d

---

10. *Frye v. United States,* 600 A.2d 808 (D.C. 1991).

11. *Collins v. United States,* 491 A.2d 480 (D.C. 1985).

ed.1978) (the "Red Book").[12] The judge denied the objection and refused to change the instruction or to supplement it in accordance with the defense request. The jury found Hammon, Porter, and Gray guilty of involuntary manslaughter on a theory of aiding and abetting. This appeal followed.

## II.

Appellants argue, first, that the trial court committed reversible error by refusing to review in camera the records on A.W. from the Florida treatment center where he was committed as a result of his plea to second degree murder of Fisher. Their arguments are directed to three distinct concerns: information concerning A.W.'s competency, Jencks statements, and *Brady* material.

## A.

Before discussing appellants' assignments of error, we address both the precise nature of the defense proffer and the materials the trial court reviewed in camera in response to that proffer. Appellants proffered that they believed A.W. was in an "insane asylum" in Florida. They also proffered that they had

> every reason to believe the witness does suffer some form of psychiatric disorder ... based on statements about the witness regarding his mental condition related by homicide detectives who have investigated the witness for numerous homicides. Attorneys who are familiar with the witness have also indicated he suffers from a psychiatric disorder.

Appellants added, more specifically, that a homicide detective named Fox had said that A.W. was "implicated in numerous other murders." The defense, however, called no witness and submitted no affidavit to support any part of the proffer.

Several times Judge Abrecht asked defense counsel for evidence to support the defense allegations. Counsel replied that, because they had no access to the requested records, they could not say what they would expect to find. They also asserted that, although there perhaps was no reason to believe that anything had impacted on A.W.'s competency since he left the District for Florida, it was just as likely that something had happened to affect his competency during that period.

The trial judge, as indicated earlier, conducted—in response to the defense proffer—what she characterized as a "complete review" of the District's records on A.W. and confirmed her earlier ruling that there was no "red flag" indicating A.W.'s incompetency to testify. She therefore declined to call for the Florida treatment center records to pursue the issue further. She also saw no legal basis for defense access to District or Florida records under the Jencks Act or *Brady*.

In connection with the judge's review we note, first, that although Gray has asked us to perform an independent, in camera review of the District documents the trial court scrutinized, neither Gray nor the other appellants arranged for transmittal of those documents to this court under seal, and thus we have not seen them.[13] We recognize that "in all criminal cases ... a designation of record may be filed but is not required," and that "the full record shall be prepared by the Clerk of the Superior Court and transmitted to the clerk of this court." D.C.App. R. 10(a)(3). This rule can be self-executing, however, only to the extent that the Superior Court Clerk's office has access to the trial record. Any documents the court has reviewed in camera to which court personnel, like the defense, do not have routine access cannot be part of the record transmitted to us unless the trial court so directs under

---

**12.** The trial took place in 1992, before the current, Fourth Edition of the Red Book was issued in 1993. The challenged language is identical to bracketed language in the current instruction. *See* Standardized Criminal Jury Instructions for the District of Columbia, No. 4.02 (4th ed.1993).

The government argues that counsel for Hammon failed to object to the instruction and that we must, accordingly, apply a plain error analy-

sis as to Hammon. In light of our disposition, we need not address this issue.

**13.** At trial, defendant Mitchell's attorney asked that a copy of the *transcript* from A.W.'s juvenile disposition hearing be included with the record. Mitchell, however, is not an appellant here; none of the appellants joined in Mitchell's request; and that transcript is not part of the record on appeal.

proper security procedures—a transmittal that defense counsel has responsibility to arrange by filing a proper motion with the trial judge. *See Cole v. United States,* 478 A.2d 277, 283 (D.C.1984) ("In both criminal and civil appeals, the appellant bears the burden of presenting this court with a record sufficient to show that error occurred at trial."). Accordingly, our inability to review A.W.'s District of Columbia records in camera is attributable, ultimately, to defense counsel's failure to ask the trial court to make this material available to us. We thus are limited in our review to the defense proffer and the trial judge's representations about what she covered in her own review.

After the trial court issued its final order in the matter, the attorney for codefendant Gaither, see *supra* note 5, asked:

> So, that there's no ambiguity in the record, is the Court's analysis and disposition based entirely on the social files in the Superior Court, and I gather the court has not seen any of the records from the institution where [A.W.'s] currently residing?

The trial judge confirmed counsel's understanding and added that she had not consulted anyone involved in the care and treatment of A.W. From this interchange, we might conclude that Judge Abrecht had conducted a review of A.W.'s social file but not his case file. See *supra* note 9. At other times, however, the judge referred to A.W.'s juvenile delinquency disposition hearing transcript, which would have been kept only in A.W.'s case file, not in his social file. *See* D.C.Code §§ 16–2331, –2332; *supra* note 9. The judge, moreover, had promised to conduct a review of A.W.'s "juvenile file" and "court records," implying more than just the social file. Furthermore, Gaither's counsel, in drawing the distinction between A.W.'s "social files in the Superior Court" and the "records from the institution where [A.W.'s] currently residing," appeared to be emphasizing the difference between District and Florida records, not a limited category of records in the District. Finally, both A.W.'s social file and his case file are accessible to the Superior Court. See *supra* note 9. It would appear, therefore, that the trial court probably reviewed A.W.'s case file, as well as his social file, but re-

viewed no other records—and thus no records relating to A.W. from the Florida treatment center where he resided at the time of trial (except, perhaps, for reports about A.W. from Florida to District authorities).

The District's records, of course, contain a great deal of information about A.W. His case file includes the findings of the court that accepted his plea and adjudicated A.W. delinquent, as well as all papers filed with the court to guide its disposition. *See* D.C.Code § 16–2331; *supra* note 9. A.W.'s social file contains the rest of the District's files on him, including "preliminary inquiries, predisposition studies, and examination reports." D.C.Code § 16–2332; *see supra* note 9. Further, the trial court noted that any report from the Florida facility to the District on A.W.'s treatment and progress would be included either in his case file or in his social file (although there is no direct evidence that any Florida report had been lodged in either place). An examination of the District's own records, therefore, presumably revealed to the trial judge whether A.W. ever had been treated in the District for any psychological disorder or other difficulty that might impact on competency. The records also presumably revealed the nature of the Florida institution and the reason for A.W.'s commitment there.

### B.

■ With this understanding of the defense proffer and the trial judge's in camera inspections, we focus, specifically, on A.W.'s competency to testify. Appellants rely on *United States v. Crosby,* 149 U.S.App. D.C. 306, 462 F.2d 1201 (1972), for the proposition that once a "red flag" appears indicating the witness may not be competent to testify, the trial court has a duty to investigate. *Id.* at 308, 462 F.2d at 1203. Although we are not bound by *Crosby* and have never formally adopted it, *see In re A.H.B.,* 491 A.2d 490, 495 (D.C.1985), we have frequently applied the same reasoning. *See, e.g., Whitaker v. United States,* 616 A.2d 843, 849–50, 854 (D.C.1992); *Mitchell v. United States,* 609 A.2d 1099, 1106 (D.C.1992); *Collins, supra* note 11, 491 A.2d at 484; *In re B.D.T.,* 435 A.2d 378, 379 n. 6 (D.C.1981); *cf. Galindo v.*

*United States,* 630 A.2d 202, 207 (D.C.1993) (concluding that defendant's reliance on *Crosby* was misplaced "since that case is factually so dissimilar as to offer little guidance here").

We find *Crosby*'s reasoning persuasive, and we are satisfied that the trial court properly applied *Crosby*'s "red flag" test to A.W. It is important to understand that *Crosby* does not require the trial court, merely on defense request, to conduct an exhaustive search of all available records to discover a "red flag." Rather, "once a trial judge is confronted by any 'red flag' of *material* impact upon competency of a witness, an inquiry must be made into the facts and circumstances relevant thereto." *Crosby,* 149 U.S.App. D.C. at 308, 462 F.2d at 1203. Thus, there is a threshold question: when a defendant asks for an in camera inspection of records that allegedly bear on a witness's competency to testify and are available to the court, but not to the defense, how far—if at all—must the court go in honoring that request?

We need not resolve how detailed or supported (by testimony or affidavit) the proffer must be to trigger such an inspection; on the basis of the defense proffer here, Judge Abrecht agreed she should examine at least the records on A.W. accessible to the court in the District. The judge thereby acknowledged the possibility of a red flag in those records, and at least on the competency issue appellants do not question the adequacy of the judge's review of A.W.'s District records. Appellants' challenge, therefore, is reduced simply to saying that Judge Abrecht should have gone further, i.e., summoned A.W.'s Florida records, to be sure he was competent to testify.

■ We are satisfied that by their very nature the District's records bearing on A.W.'s behavior, and on the proper disposition for it, would have revealed a "red flag" if A.W.'s mental competency could have been questioned; and, like appellants, we are con-

fident that the conscientious trial judge would have discovered in those records any indicia of A.W.'s incompetency if any was to be found. Having found none in the District's records, the judge was not required to go further, with a gratuitous search of A.W.'s Florida records, based on pure speculation that between the time of A.W.'s disposition and appellants' trial, A.W. may have become incompetent to testify and that the Florida "treatment center" where A.W. was housed may not have seen fit to report it to District authorities.[14]

■ "A trial court's ruling on a witness' competency should not be disturbed unless the record provides unmistakable evidence that the trial court's impressions are defective." *Hilton v. United States,* 435 A.2d 383, 388 (D.C.1981). Our review of the transcript does not reveal on its face any indication that A.W. testified in an incompetent manner. Nor does anything in his testimony reflect any evidence of mental confusion or incompetence. *Compare (Albert) Smith v. United States,* 414 A.2d 1189, 1198 (D.C. 1980) (noting that "the trial court's decision as to competency will be sustained even when it proceeds without a voir dire where the transcript reveals intelligible comprehension [by the witness] in terms of answering the questions that were asked" (internal quotation marks omitted) (alteration in original)) *with Vereen v. United States,* 587 A.2d 456, 457 (D.C.1991) (concluding that trial court should have consulted psychiatric expert when witness testified about "see[ing] 'vapors' on the morning of trial and had experienced a premonition two nights earlier").

We also note the weak generalization of appellants' initial proffer based on assertion, not affidavit, that attorneys familiar with A.W. "indicated he suffers from a psychiatric disorder." Surely, once the trial judge had reviewed A.W.'s District records without seeing a "red flag," no extension of that search to Florida was required without a more detailed, documented proffer—in itself a red

---

14. Juveniles committed to institutions on findings of delinquency are not routinely committed for treatment reflecting a lack of mental competence. *See* D.C.Code § 16–2320(c) (1989 Repl.). Accordingly, the fact that A.W. was in a "treat-

ment center" did not inherently suggest a "red flag." *See In re B.D.T.,* 435 A.2d 378, 379 & n. 6 (D.C.1981) (concluding that witness's attendance at school for slow learners did not raise "red flag" of incompetence).

flag—indicating that further inquiry would bear productively on the question of A.W.'s competency.

■ Finally, we emphasize that none of the defendants asked for a voir dire of A.W., or sought to cross-examine A.W. on issues bearing on competency—inquiries that at least might have strengthened the otherwise vague and undocumented defense proffer. *Cf. Mitchell,* 609 A.2d at 1102–03 (concluding that defense was not entitled to independent psychiatric examination when trial court offered preliminary option of forensic screening to determine whether grounds existed for such examination).[15] We therefore conclude that the trial court, by examining the records available in the District, satisfied whatever obligation there may have been to investigate A.W.'s competency to testify at appellants' trial.

### C.

■ Under *Brady,* appellants fare no better. Citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), appellants argue that the trial court denied them due process by refusing to conduct an in camera review of A.W.'s District and Florida records for *Brady* material.[16] In *Ritchie,* the Supreme Court held that the respondent was entitled under *Brady* to learn, from an in camera trial court review, whether a state's protective services agency file concerning suspected mistreatment and neglect of the respondent's child "contain[ed] information that may have changed the outcome of his trial had it been disclosed." *Ritchie,* 480 U.S. at 61, 107 S.Ct. at 1003. This court similarly has held that, under certain circumstances, records in confidential juvenile case files are subject to *Brady* disclosure. *See (Darryl) Smith v. United States,* 665 A.2d 962, 968–69 (D.C.1995) (citing *Ritchie* and concluding that defendant had made sufficient showing to warrant in camera review of juvenile disposition transcript); *(Dwayne) Johnson v. United States,* 537 A.2d 555, 558–59 (D.C.1988) (citing *Ritchie* and ruling that, although juvenile case files are subject to *Brady,* there was no "reasonable probability" that production would have affected outcome of trial).[17] We have intimated but not resolved how *Brady* applies to juvenile medical records. *See Green v. United States,* 651 A.2d 817, 819 n. 5 (D.C.1994) (citing *Ritchie* and suggesting medical files may be available to in camera review for *Brady* material); *Brown v. United States,* 567 A.2d 426, 427–29 (D.C.1989) (citing *Ritchie* and emphasizing importance of balancing doctor-patient privilege against *Brady* interest).

In any event, we need not resolve on the merits any *Brady* disclosure/right-to-privacy issue in this case because appellants have

---

**15.** We reject Porter's argument that the trial court committed plain error in failing, sua sponte, to voir dire A.W. We also note that the trial court—at defense request—gave counsel the opportunity to speak with A.W. before he took the witness stand.

**16.** Appellants also suggest that the trial court violated their Sixth Amendment right to compulsory process and urge us to decide that question left open by *Ritchie. See Ritchie,* 480 U.S. at 55–56, 107 S.Ct. at 1000–01 (declining to resolve compulsory process issue because "compulsory process provides no *greater* protections in this area [of discovering identity of witnesses and requiring production of exculpatory material] than those afforded by due process"). Because appellants' *Brady* request calls for a due process analysis, we believe *Ritchie*'s statement that the right to compulsory process affords no greater protection than due process in seeking access to exculpatory material is authority enough for a conclusion that appellants have no effective Sixth Amendment claim here to the requested juvenile case files and medical records.

**17.** The trial court relied on *Collins v. United States, supra* note 11, 491 A.2d at 485, for the proposition that juvenile files are shielded from *Brady* disclosure because they are not public documents in the possession of the prosecutor. This *Collins* analysis would not necessarily be conclusive, however, because *Collins* was decided before *Ritchie,* which remanded for possible defense access, after in camera trial court inspection, to state protective service agency records not accessible to the prosecutor. *See Ritchie,* 480 U.S. at 44 n. 4, 107 S.Ct. at 994 n. 4 ("There is no suggestion that the Commonwealth's prosecutor was given access to the file at any point in the proceedings, or that he was aware of its contents."). We also note that in *Collins,* in declining to order disclosure, we relied in part on the fact that both the trial court and this court conducted an in camera review of the documents in question and found no *Brady* violation. *See Collins,* 491 A.2d at 485. In this case, however, we have not reviewed the records the trial judge examined in camera because no party to this appeal asked to have them sent to us under seal.

failed to make even a proffer adequate to overcome A.W.'s privacy interest in his juvenile and medical records. As the Supreme Court held in *Ritchie:* "[Defendant], of course, may not require the trial court to search through the [relevant] file without first establishing a basis for his claim that it contains material evidence." *Ritchie,* 480 U.S. at 58 n. 15, 107 S.Ct. at 1002 n. 15. As discussed previously at length in Parts II.A. and II.B., appellants proffered only that they believed, based on unsupported hearsay statements of detectives and attorneys who had worked with A.W., that A.W. suffered from an undefined psychiatric disorder and was implicated in unspecified homicides. Again, we note that appellants did not submit affidavits from their sources or attempt to call witnesses in support of these allegations—despite a continuance in the trial, a special hearing the trial judge scheduled to determine issues pertaining to A.W.'s competency and the application of the Jencks Act and *Brady* to A.W.'s records, and repeated requests by the trial court to provide some factual basis for their proffer.

Other courts reviewing similar proffers have concluded that the defendants had failed to offer sufficient detail to warrant in camera review for *Brady* material. *Compare Cockerham v. State,* 933 P.2d 537, 543–44 (Alaska 1997) (holding that proffer seeking in camera inspection of juvenile case file of government witness, to look for impeachable adjudications affecting credibility, was inadequate where defense had failed to cross-examine witness about possibility of juvenile record and had proffered only the existence of outstanding warrant and appointment of guardian ad litem for witness as basis for suspecting juvenile record) *and State v. Behnke,* 203 Wis.2d 43, 553 N.W.2d 265, 270–71 (Ct.App.), *review denied,* 205 Wis.2d 135, 555 N.W.2d 815 (1996) (holding that fact that complaining witness had sought medical treatment after assault and had, in past, inflicted wounds on her arm was insufficient proffer to support defendant's request for in camera inspection of mental health records to show in present case that witness's wounds had been self-inflicted or she had "flashback" to previous assaults) *with Love v. Johnson,* 57 F.3d 1305, 1313–14 (4th Cir.

1995) (holding that proffer for in camera inspection of state medical and mental health records was sufficient where defendant demonstrated that complaining witness had been hospitalized for "bizarre behavior," was taking Ritalin for hyperactivity, and complaining witness's mother had made exculpatory statements likely to be found in witness's juvenile file). Appellants proffered to the trial court no more than vague allegations that A.W.'s District and Florida records contained information relating to A.W.'s competency and involvement in other crimes which might be exculpatory within the meaning of *Brady.*

Finally, we note that the government elicited, in its direct examination of A.W., that A.W. had pleaded guilty to the second degree murder of Charles Fisher in exchange for dismissal of another pending murder charge, and that A.W. had been placed, as a result, in "residential treatment" in Florida. These disclosures called the jury's attention to the very kinds of information that appellants proffered might exist in A.W.'s files: that A.W. was receiving "treatment" and was, by nature, a violent person who was implicated in the deaths of others besides Fisher. In light of these disclosures to the jury, a further review of A.W.'s records in camera would not have been likely to reveal any additional information with a " 'reasonable probability' " of affecting the trial's outcome. *(Dwayne) Johnson,* 537 A.2d at 559 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985)) (concluding that benefit of impeaching witness with prior delinquency adjudication was doubtful where witness testified to being "locked up at Oak Hill").

**D.**

We now consider the Jencks Act issue. The trial judge cited *Frye v. United States,* 600 A.2d 808 (D.C.1991), for the proposition that the court need not make a Jencks inquiry for juvenile files to which the prosecution has not sought access. We think this a fair reading of *Frye. See id.* at 811–812 (distinguishing material in possession of the "investigative or prosecutive branches of government" from "material within the control

of the court," such as juvenile files, and ruling that Jencks Act does not " 'embrace [such] materials to which the prosecutor has never sought access' " (alteration in original) (quoting *United States v. Hutcher,* 622 F.2d 1083, 1088 (2d Cir.1980))).[18]

We find no error in the trial court's refusal to review A.W.'s District and Florida files for Jencks material because, with one exception, the prosecution did not have access to the files at issue. It appears that the prosecution did have access to the tape of A.W.'s delinquency disposition hearing, and that defendant Mitchell's counsel asked the court to include a transcript of it in the record in case of an appeal. See *supra* note 13. This potentially presented the Jencks Act "unequal access" issue left open in *Frye,* 600 A.2d at 812. Because Mitchell was acquitted, however, see *supra* note 5, and none of the appellants joined in Mitchell's request for inclusion of the transcript in the record, see *supra* note 13, that request—which the trial judge did not honor—became moot and the transcript is not before us. We therefore need not address the matter further, see *supra* note 13, except to note that the trial judge reviewed the transcript, found that it contained no statements by A.W., and therefore ruled that it had no material subject to Jencks disclosure.

\* \* \*

We conclude, accordingly, that the trial court committed no reversible error by refusing to subpoena the Florida records for in camera inspection on the question of A.W.'s competency, or by refusing to subject the District and Florida records to Jencks Act and *Brady* analysis.

### III.

▨ Appellants also contend the trial court erred by (1) instructing the jury that it could convict defendants as aiders and abetters even if the defendants did not share the same intent as the principal, as long as the defendants knowingly associated themselves with the principal, participated in the crime, and intended to help the crime succeed; and by (2) instructing the jury that an aider and abettor is responsible for the natural and probable consequences of the crime. See *supra* Part I.

These instructions accurately reflected the law. See *In re T.H.B.,* 670 A.2d 895, 902 (D.C.1996) ("Appellant need not necessarily have intended the particular crime which was committed by the principal in order to be liable for what occurred." (internal quotation marks omitted)); *Ingram v. United States,* 592 A.2d 992, 1001–02 (D.C.1991) (noting that "[w]e have said that there is no requirement that the aider and abettor have the identical intent of the principal at the time and place" as long as the consequences are reasonably foreseeable (internal quotation marks omitted)). The trial judge, therefore, committed no instructional error.

### IV.

▨ Finally, each appellant contends the evidence was insufficient to show either that he was the proximate cause of Fisher's death or that there was a principal whom he aided and abetted. We review the evidence in the light most favorable to the government, making no distinction between direct and circumstantial evidence. See *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987). The government's expert testified that Fisher died from head trauma consistent with either a blow to the head or a fall on the concrete stairs where he had been standing. Either means is consistent with the government's theory and would be a direct, foreseeable result of appellants' fight with Fisher. Furthermore, even though the government need not prove the identity of a principal, see *Green v. United States,* 608 A.2d 156, 159–60 (D.C.1992) (upholding conviction based on theory of aiding and abetting as "coprincipal"), the government introduced sufficient evidence through A.W.'s testimony to estab-

18. In *Frye,* one of the sources we relied on for Jencks analysis, by analogy, was a *Brady* case, *Collins,* which to some extent has been limited by

the Supreme Court's analysis in *Ritchie.* See *supra* note 17. *Frye,* however, had substantial

lish A.W. as the principal.[19] Indeed, in both opening statements and closing arguments to the jury, appellants emphasized that A.W. was entirely responsible for the death of Fisher. We therefore conclude that the evidence was more than sufficient to sustain the convictions for aiding and abetting.

*Affirmed.*

Jencks Act authority for its analysis and cannot be said to have relied, indispensably, on *Collins*.

19. We note that Porter called as a witness Tamus Gates, who testified that A.W. was the primary actor in the assault on Fisher and that appellants were not present.