Erik JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–1252.

District of Columbia Court of Appeals.

Argued Oct. 21, 1997.
Decided July 23, 1998.

Gene R. Johnson, for appellant.

D. Blane Brooks, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese III, Robert D. Okun and Lisa A. Prager, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, SCHWELB, and RUIZ, Associate Judges.

STEADMAN, Associate Judge:

Erik Jones was convicted by a jury of one count of accessory after the fact to first degree murder while armed, D.C.Code § 22–106 (1996), and one count of obstruction of justice, D.C.Code § 22–722(a) (1996).[1] The

---

1. The jury acquitted Jones of an additional count of obstruction of justice, and counts of possession of a firearm during a crime of violence and assault with a dangerous weapon. All three of these counts related to the events in the "cut," which we explain *infra*. The trial court granted appellant's motion for a judgment of acquittal on three other charges, as discussed *infra*. One of

**162**

only issue on appeal is whether the evidence presented to the jury was sufficient to support those convictions.

■ When reviewing a challenge to the sufficiency of the evidence, we examine that evidence in the light most favorable to sustaining the verdict. *See, e.g., Hammon v. United States,* 695 A.2d 97, 107 (D.C.1997); *Irick v. United States,* 565 A.2d 26, 30 (D.C. 1989); *McClain v. United States,* 460 A.2d 562, 567 (D.C.1983). We must recognize "the jury's right to assess credibility and to draw reasonable inferences from the evidence it has heard," *Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991), and accord equal weight to circumstantial evidence and direct evidence, *Hammon, supra,* 695 A.2d at 107. The government need not disprove every theory of innocence. *Lattimore v. United States,* 684 A.2d 357, 359 (D.C.1996); *Irick, supra,* 565 A.2d at 30–31. We shall reverse a conviction for insufficiency only if there is no evidence from which a reasonable mind might find the defendant guilty beyond a reasonable doubt. *Harris v. United States,* 668 A.2d 839, 841 (D.C.1995). Applying these standards for review of claimed evidentiary insufficiency, we affirm the convictions.

**I.**

From the evidence presented by the government, the jury could have concluded that the following events took place on the evening of April 9, 1994. At approximately 11:30 p.m., Rogest Webb rose from his seat on a curb in the 200 block of K Street, S.W., and walked north along a nearby walkway or "cut." In the cut, Webb encountered Arthur Rice, an acquaintance, heading in the opposite direction, and he spoke briefly to Rice. After Rice passed by, Webb turned to see

him walk quickly towards Steven Dunbar, who also had been sitting on the K Street curb near the entrance to the cut. Webb noticed that Rice was carrying a pistol. Rice then shot Dunbar seven times, killing him.

Webb testified that once he heard the shots, he ran for safety towards the back of the cut. He then jumped over a fence, looked back into the shadowy cut, and saw appellant, whom he knew from the neighborhood as "Erky–Berk." Appellant stood about fourteen feet away with his arm raised. Webb testified that appellant fired two or three shots at him, none of which hit, but acknowledged that he could not see a weapon in appellant's upraised hand. Webb ran to a friend's house and told him what happened; the friend testified at trial that Webb told him, "[T]he guy tried to shoot me because I saw him." Webb later identified appellant and Rice from separate photo arrays, and he identified appellant in court.

This was not Webb's first encounter with appellant and Rice that day. He had seen both of them earlier "[h]anging around K Street," and on other occasions he would frequently see them "[w]alking along or sitting in the cut." Appellant was wearing the same outfit—"yellowish" boots, black jeans, and a gray sweatshirt—when Webb saw him in the cut as he had been wearing "around noon" that day. Other witnesses also testified to the fact that appellant and Rice were frequently seen together in the neighborhood.

Jermaine Goings saw two men who he thought were appellant, whom he knew well, and Rice, with whom he was acquainted, emerge from the cut and shoot Dunbar.[2] After the shooting, Goings saw the two then run back into the cut.[3] Janice Dudley, who

these was assault with intent to kill while armed, with respect to which the trial court permitted the lesser-included offense of assault with a dangerous weapon to go to the jury.

2. Goings could not see the faces of the two men because they wore hoods. He testified that he thought the perpetrators were "Erky–Berk and Art" "[j]ust by the way they walked. It just looked—just by saying if I seen them every day [sic]." Goings had lived in the neighborhood for nine years and would see appellant "almost every day." He would see Rice less often, "once in

a while." Goings acknowledged on cross-examination that because he did not see their faces, he could not "identify" appellant as being one of the men.

Goings did not know whether one or both of the men shot Dunbar.

3. Another witness, Jimmy Lewis, confirmed that two men had emerged from the cut, one of them shot the decedent, and then both men fled into the cut. However, Lewis could not identify either assailant because the incident "happened so quick."

lived in the 200 block of K Street, walked out of her house after she heard the gunshots and saw appellant and Rice running together out of a second cut closer to Third Street. Dudley lived on that stretch of K Street for most of her life and had known appellant for approximately twenty years. She saw appellant "very often." Rice, she testified, "was new to our neighborhood just by two to three years." Although Dudley knew Rice, too, she saw him less frequently than she saw appellant.

On May 10, 1995, while executing a search warrant in an unrelated case at 211 I Street, S.E., police recovered the following note:

Dear Butchie

What's up? Right about now you and Drapper probably have some fun. I need you to talk to Vance before the lawyer's talk to him for you can program him on what to say. I am going to give you his number 554–0577 he also surpose to get in contact with somebody for me. I need you to tell him what to say. Because! I don't what to talk to him like that on the phone. Alright! I want him to say that Erik and Arthur was standing across the street in the cort when the shooting started and he saw people running and screaming. Tell Mr. William's that I said Hayman. I appreciate where thing you have done for me. Thank's man you and shorty be easy and take care.[4]

The letter was undated and unsigned, although an expert testified that it was in appellant's handwriting. The "Vance" identified in the note proved to be Vance Matthews, a young man who lived in the neighborhood. He was acquainted with appellant, Rice, and Dunbar, and his telephone number was the same number in the note. Matthews did not witness the shooting implicating appellant and Rice because he was watching a televised boxing match at a friend's house on Third Street, S.W.

## II.

We start with appellant's challenge to his conviction for accessory after the fact to first degree murder while armed.[5] The jury returned only a general verdict, but the government argues that the conviction is based on appellant's actions immediately after the murder of Dunbar, including his encounter with Webb in the cut and his flight with Rice out of another cut.

The elements of accessory after the fact to first degree murder while armed are: (1) that the offense of first degree murder while armed had been committed, (2) that the defendant knew that this offense had been committed, (3) that, knowing that this offense had been committed, the defendant provided assistance to the person who committed it, and (4) that the defendant did so with the specific intent to hinder or prevent that person's arrest, trial, or punishment. *See* Criminal Jury Instructions for the District of Columbia, No. 4.01 (4th ed.1993); *see also Butler v. United States*, 481 A.2d 431, 442–43 (D.C.1984). The jury was instructed accordingly without objection.

That Rice committed first-degree murder of Dunbar is uncontested. However,

4. The note appears exactly as it was reproduced in the written order denying appellant's post-trial motions for judgment of acquittal.

5. Appellant makes several specific sufficiency arguments as to this conviction that we may dispose of summarily. First, he suggests that Rice had already successfully escaped when he (appellant) encountered Webb in the alley, and that therefore any assistance rendered would be ineffectual. But an eyewitness who had known both appellant and Rice for several years testified that they ran *together* out of an adjacent cut shortly after the shooting stopped, a fair indication that Rice hardly thought he had already made his escape.

Second, appellant contends that it would have been physically impossible for Webb to see Rice shoot Dunbar from the back of the cut, as he testified. An architect had testified that there was a wall that would have blocked a view from the back of the cut to the area outside the cut where Dunbar was killed, but there was contrary evidence. Dealing with any discrepancies was a quintessential jury matter. The same may be said for appellant's assertion that it was impossible from the timing and physical layout that he would be both at the scene of the shooting and, shortly thereafter, back in the cut threatening Webb. The witnesses were testifying to a fast-moving series of events that the jury had to resolve, and we cannot conclude that it was impossible for him to have been in both places sequentially.

as noted above, a defendant may not be convicted of accessory after the fact to murder unless the government has proven that the defendant knew before he acted that the murder had actually been perpetrated. *See Little v. United States,* 709 A.2d 708, 712–14 (D.C.1998). From the sequence of events, we think the jury could conclude beyond a reasonable doubt that appellant knew Rice had murdered Dunbar. Appellant was placed as a witness to the event. Dunbar was shot seven times at close range, three times to the head, from which the jury as well as appellant could infer that death was instantaneous. In any event, from the close affiliation of Rice and appellant both before and after the killing, the jury could reasonably infer that appellant was aware of Rice's plan to kill Dunbar and, at least by the time of the joint escape and running out of the cut, Rice had apprised appellant of the success of the mission.

■ A third element of the offense of accessory after the fact is that the defendant "act personally to aid or assist the felon to avoid detection or apprehension for the crime or crimes." *Outlaw v. United States,* 632 A.2d 408, 411 (D.C.1993) (quoting *Howell v. State,* 62 Md.App. 278, 489 A.2d 55, 58 (1985)). As to the types of conduct that aid or assist the felon in this respect, examples include "open force and violence to rescue or protect him," *id.* (quoting IV W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 38 (Chitty ed. 1826)), "inducing a witness to absent himself or to remain silent," *id.* at 411–12 (quoting 2 WAYNE R. LaFAVE & AUSTIN W. SCOTT, SUBSTANTIVE CRIMINAL LAW § 6.9, at 168–69 (1986)), and "aiding the felon in making his escape," *id.* at 411 (quoting 2 LaFAVE & SCOTT, *supra,* § 6.9, at 168).

The government maintains that appellant engaged in two different actions that provided after-the-fact assistance to Rice. The first was shooting at or otherwise threatening Webb in the cut. This action, the government argues, provided assistance to the principal felon in two ways: (1) by attempting to eliminate an eyewitness to the murder or at least intimidate him to not speak with authorities about the matter or testify at trial, and (2) by scaring off Webb and thereby preventing an attempt to pursue Rice or interfere with his escape.

We think a reasonable jury could conclude that appellant shot at Webb in an effort to "induc[e] a witness to absent himself or to remain silent." *See Outlaw, supra,* 632 A.2d at 411–12 (quoting 2 LaFAVE & SCOTT, *supra,* § 6.9, at 168–69). Webb had passed Rice and even spoken to him moments before Rice shot Dunbar; he also looked back through the cut and personally witnessed the murder. A jury could reasonably infer that, by firing in Webb's direction, appellant wanted to frighten away a key eyewitness and also suggest the consequences of antagonizing Rice. The shooting also was susceptible to an interpretation as "open force and violence to rescue or protect" the felon by clearing an escape route through the cut. *See id.* at 411 (quoting BLACKSTONE, *supra,* at 38). Goings testified that appellant and Rice ran together into the cut immediately after Dunbar was shot, and Dudley later saw the two emerge from a second cut nearby.

■ That the jury acquitted appellant of the various counts relating to the Webb incident, *see* note 1, *supra,* does not negate the sufficiency of the evidence as to the conviction for being an accessory after the fact. "It is now well-established that inconsistent verdicts by themselves do not mandate reversal." *United States v. Dobyns,* 679 A.2d 487, 490 (D.C.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997); *see also (Diane) Smith v. United States,* 684 A.2d 307, 312 (D.C.1996). So long as the evidence was sufficient to support the conviction in question, the fact that the jury acquitted the appellant of certain related counts does not invalidate the conviction. *Ransom v. United States,* 630 A.2d 170, 172 (D.C.1993).[6]

Furthermore, the outcomes are not necessarily inconsistent. The government was not able to introduce a working pistol or discarded shell fragments that it could link to the

---

6. We think that any attempt to analyze the "true" basis of a jury's decision when engaged in a determination of evidentiary sufficiency would be an unacceptable dilution of the inconsistent verdict rule with no discernible limits. *Cf. Dobyns, supra,* 679 A.2d at 490–92.

Jones–Webb altercation and Webb suffered no bullet wounds. The trial court in granting judgments of acquittal on the counts of carrying a pistol without a license and assault with intent to kill while armed expressed concern about the possible use of an imitation firearm. These and other aspects of the case might have led the jury to have some doubt as to the related counts but still remain thoroughly convinced that Jones's activities in the cut against Webb made him an accessory after the fact.[7]

The second form of assistance rendered by appellant, the government argues, was to join Rice and escort him as he ran through the cut and an adjacent one and emerged further up K Street. Appellant might be presumed to have carried the same weapon Webb thought he had brandished in the cut, and to have remained available to scare off or eliminate any others he and Rice might encounter during their flight. The jury arguably could find that by escorting Rice through two cuts, into K Street, and off into the distance, appellant was "aiding the felon in making his escape." *See Outlaw, supra,* 632 A.2d at 411 (quoting 2 LaFave & Scott, *supra,* § 6.9, at 168). *Cf. Prophet v. United States,* 602 A.2d 1087, 1092–93 (D.C.1992) (affirming conviction for aiding and abetting robbery where, inter alia, appellant "followed behind [the principal], looking in all directions as a lookout might do . . . [,] watched the robbery and murder and immediately met up with [the principal] at the other end of the alley through which [he] fled.").[8]

But we need not here decide whether the evidence of the second form of asserted assistance would alone suffice to support the verdict. Even if joining Rice in his flight would not in itself be enough to render appellant an accessory after the fact, this action could be considered by the jury as further proof bearing upon the nature and purpose of any ambiguous action in the cut.[9] The "Dear Butchie" letter provided further evidence to the same end, vividly demonstrating that appellant was quite interested in preventing Rice's apprehension, trial, or punishment. Appellant had written that he needed to "program [Vance] on what to say," not only on the whereabouts of appellant himself but also those of Rice. *Cf. Ruffin v. United States,* 524 A.2d 685, 706 (D.C.1987) (per curiam) (holding that sufficient evidence supported an accessory after the fact conviction where, inter alia, appellant urged principal not to speak to the police). The jury might also have taken the letter as a reflection of appellant's consciousness of his own guilt. We have long held that a defendant's effort to interfere with a witness may constitute an implied admission of guilt. *See (Darryl) Smith v. United States,* 591 A.2d 229, 232 (D.C.1991); *(John) Smith v. United States,* 312 A.2d 781, 784–85 (D.C.1973).

The final element of an accessory after the fact crime is that the defendant

---

7. The dissent would make much of Webb's acknowledgment in cross-examination that he did not positively see a firearm in appellant's hand and that he did not know whether someone else could have been in the dark shooting at him. But what an honest witness might acknowledge as theoretical possibilities hardly weakened the force of Webb's repeated and categorical assertions that appellant fired at him and that he was the only one back there at the time. While the evidence was sufficient to warrant a jury conclusion that appellant had in fact shot at Webb, even a similitude of such an action by appellant in the cut would suffice to support the conviction.

The quality of Webb's testimony bears no comparison with the shortcomings in *Crawley v. United States,* 320 A.2d 309 (D.C.1974), where the key witness did not previously know the defendant, had serious difficulties in observation, gave a significantly discrepant description immediately after the incident and was unable to identify the defendant in court.

8. Rice's escape is unlike the situation we encountered in *Williams v. United States,* 478 A.2d 1101 (D.C.1984). In *Williams,* we held that the driver of a getaway car was not an accessory after the fact to armed robbery because the offense was not yet complete; driving off with the loot was treated as part of the asportation element of robbery. *Id.* at 1105. Escape is of course not an element of the murder in this case.

On the other hand, it is clear from *Prophet* that a person serving only a lookout function *can* be an aider and abettor. We are unable to perceive any principle that would distinguish the effective assistance of a lookout, whether he be deemed an aider and abettor or an accessory after the fact.

9. Conversely, the action in the cut might be used to bolster the interpretation of appellant's role in accompanying Rice in his flight.

render his assistance with the specific intent that it prevent the principal's arrest, trial, or punishment. The jury may infer specific intent from the defendant's actions. *(Joel) Smith v. United States*, 466 A.2d 429, 432 (D.C.1983) (per curiam); *see also Carmon v. United States*, 498 A.2d 580, 583 (D.C.1985) ("The evidence that appellant concealed the sweaters under his coat and walked out of the store without paying for them was sufficient to permit the court to infer the requisite specific intent [to shoplift]."). Indeed, questions of intent almost by definition can be determined only by resort to circumstantial evidence. *See Shelton v. United States*, 505 A.2d 767, 770 (D.C.1986) (observing that specific intent "is a state of mind particular to the accused and unless such intent is admitted, it must be shown by circumstantial evidence") (quoting *Massey v. United States*, 320 A.2d 296, 299 (D.C.1974)). We think that the appellant's acts of assistance here, if believed by the jury, when coupled with the "Dear Butchie" letter, and the close association between appellant and Rice, including at the scene of the crime itself,[10] plainly support a finding of the requisite intent.

■ Although affirming the conviction for accessory after the fact to first degree murder while armed, we must remand for resentencing. Appellant was sentenced to a term of imprisonment of fifteen years to life for this conviction. The statute, however, establishes a maximum sentence of twenty years' imprisonment for an accessory after the fact "to any crime punishable by death." *See* D.C.Code § 22–106 (1996). In *Butler, supra,* 481 A.2d at 447, we held that first degree murder while armed is a "crime punishable by death" within the meaning of the accessory after the fact statute, even though the maximum sentence for first degree mur-

der is now life in prison pursuant to D.C.Code § 22–2402(a) (1996).

## III.

■ We turn now to appellant's conviction for obstruction of justice. This conviction is based on the "Dear Butchie" letter. Appellant does not dispute that he wrote the letter, nor does he contend that the government failed to prove any substantive element of the offense. Appellant contends solely that the government failed to prove *when* he wrote it. The indictment alleged that appellant wrote it "[o]n or about December 22, 1994 to May 10, 1995." Strictly speaking, this is not a sufficiency argument in its normal form. Rather, appellant seems to be arguing that the government constructively amended the indictment or impermissibly varied therefrom by failing to prove a fact asserted in the indictment. *See Pace v. United States*, 705 A.2d 673, 676–78 (D.C. 1998). Nonetheless, however analyzed, the evidence is sufficient.

■ We start with the observation that "[w]hen an indictment charges that the offense occurred 'on or about' a certain date, as it did here, a defendant is on notice that a *particular* date is not critical." *Ingram v. United States*, 592 A.2d 992, 1007 (D.C.1991) (emphasis added). "The evidence will conform to the indictment in such circumstances if it establishes that the offense was committed on a date reasonably close to the one alleged." *Id.*

We think there was sufficient evidence that appellant wrote the note reasonably close to the window of time alleged in the indictment. The government introduced as evidence the court jacket in this very same case, which

---

**10.** There is no impermissible inconsistency between appellant's alleged presence at the killing itself and his conviction as an accessory after the fact. Perhaps appellant could have been charged as an aider and abettor, but it does not follow that he could not *also* be charged as an accessory after the fact for those actions which occurred once the murder was completed. The long-established rule is quite the contrary. *See (James) Smith v. United States,* 113 U.S.App. D.C. 126, 127, 306 F.2d 286, 287 (1962) (per curiam). As we interpreted *(James) Smith* in *Clark v. United States,* 418 A.2d 1059, 1062 n. 4 (D.C.1980),

"[o]ne can be at the scene of the crime *and be a principal participant,* but one can *also* do other acts which would justify a conviction as an accessory after the fact." (Emphasis added.) The reference in *Outlaw* that an accessory after the fact cannot also act as a principal, citing a Maryland case, presumably used the word "principal" in its strict common-law sense, i.e., not an aider and abettor. *See* 632 A.2d at 411. A statute has modified the common law in this jurisdiction so that aiders and abettors are treated as principals. *See* D.C.Code § 22–105.

showed that, pending trial, appellant had been in the custody of a third party until December 23, 1994. On that date, for reasons that are not important here and were not made known to the jury, a Superior Court judge revoked appellant's third-party custody status and ordered him held without bond. The note was recovered on May 10, 1995, in a bedroom belonging to William Sweeney, whose nickname is "Draper." A man known as "Butchie," the addressee of the note, had previously lived at the same townhouse. The detective who testified as to the recovery of the note also testified that he had executed a search warrant at the same premises on November 1, 1994, and that this letter had not been found.

The jury could infer that appellant wrote the "Dear Butchie" letter while he was incarcerated, *viz.*, sometime on or after December 22, 1994, the day before his bond was revoked. In the letter, appellant stated that he must speak with Vance to "program him on what to say," but that he could only do so over the telephone and that he needs Butchie's help as an intermediary. If appellant was incarcerated at the time, then his reluctance to speak over the telephone would be quite understandable since his conversation might be monitored by corrections authorities. But if he was not incarcerated at the time, then he could have arranged his own meeting with Vance and personally advised him on what to say. Therefore, the jury could reasonably infer that appellant wrote the letter after he was incarcerated in December but, of course, before it was discovered in May. The detective's testimony that they had not found the letter during a search in November 1994, though by no means dispositive, helped to narrow the range of dates to the period specified in the indictment.

## IV.

Here, the highly experienced trial judge, who of course was present throughout the proceedings and heard all the evidence personally, carefully considered appellant's posttrial written motion for judgment of acquit-

tal[11] and concluded that the evidence was sufficient to support both convictions. She wrote a fifteen-page opinion setting forth the basis for that conclusion. On the cold record before us, we are quite unconvinced by appellant's arguments that the trial judge was wrong.

Accordingly, we affirm the judgment on the obstruction of justice count and the conviction for accessory after the fact to first degree murder while armed, but remand for resentencing on the latter conviction.

*So ordered.*

SCHWELB, Associate Judge, concurring in part and dissenting in part:

The government contends that Erik Jones engaged in two discrete actions which are supposed to have constituted accessoryship after the fact (AAF) to murder. First, Jones is alleged to have shot at and attempted to intimidate Rogest Webb while Webb was running through the "cut" and away from the scene of Steven Dunbar's murder. Second, Jones fled from the area a few minutes later in the company of the actual shooter, Arthur Rice.

In my opinion, Jones' AAF conviction cannot fairly be sustained on either of the government's theories. Webb's own admissions on the witness stand about what he saw and did not see in the cut raised a reasonable doubt, as a matter of law, as to that aspect of the prosecution's case; moreover, the jury acquitted Jones of all of the charges which were based exclusively on Jones' alleged encounter with Webb. The prosecution's second theory fares no better, for, notwithstanding the majority's ingeniously creative characterization of Jones' alleged conduct as "escorting" the murderer, see pp. [166], *infra*, what Jones actually did—specifically, he ran away, with Rice at his side—cannot reasonably be classified as accessoryship after the fact.

Taken as a whole, the evidence might perhaps support a suspicion that Jones committed the charged offense, but it falls consider-

---

11. Appellant had orally made such motions at the close of both the government and the defense case; the trial court reserved ruling on both oral motions pursuant to Superior Court Criminal Rule 29(b).

ably short of proving his guilt beyond a reasonable doubt. The government's first theory falters on the facts, while the second fails on the law. Accordingly, I would reverse Jones' conviction for being an accessory after the fact.[1]

## I.

The standard of review is not in doubt. We may set aside Jones' AAF conviction for evidentiary insufficiency only if, after viewing the record in the light most favorable to the prosecution, we conclude that there was no evidence upon which an impartial jury could fairly find, beyond a reasonable doubt, that Jones committed the offense. *See* maj. op. at 162; *Harris v. United States,* 668 A.2d 839, 841 (D.C.1995). Our review is necessarily deferential, for it is up to the jury, and not to an appellate tribunal, to assess credibility and to draw reasonable inferences.

But as Judge (now Justice) Thomas stated for the court in *United States v. Long,* 284 U.S.App. D.C. 405, 409, 905 F.2d 1572, 1576, *cert. denied,* 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990), "[w]e do not … fulfill our duty through rote incantation of these principles followed by summary affirmance." Our review, in other words, is not "entirely toothless." *United States v. Salamanca,* 300 U.S.App. D.C. 384, 392–93, 990 F.2d 629, 637–38, *cert. denied,* 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993); *see also Roy v. United States,* 652 A.2d 1098, 1103 (D.C. 1995). On the contrary, a motion for a judgment of acquittal is "an important safeguard to the defendant," for it "tests the sufficiency of the evidence against him, and avoids the risk that a jury may capriciously find him guilty [even] though there is no legally sufficient evidence of his guilt." *Crawley v. United States,* 320 A.2d 309, 311 (D.C.1974)

(quoting Wright, Federal Practice and Procedure: Criminal § 461 (1969)).

Although appellate judges are limited to a cold record in assessing the sufficiency of the prosecution's evidence, they too have a significant role to play. As this court stated in *Crawley, supra,* it is

> proper—and indeed necessary—for [members of this court] to draw upon our own experience, value judgments, and common sense in determining whether the verdict reached was in keeping with the facts.

*Id.* at 312 (citing 8 Moore's Federal Practice § 29.06).

Moreover, as the court stated in *Salamanca* in a passage that might easily have been written with Erik Jones in mind,

> [t]he sufficiency of the evidence warrants particular scrutiny when the evidence strongly indicates that a defendant is guilty of a crime other than that for which he was convicted, but for which he was not charged. Under such circumstances, a trier of fact, particularly a jury, may convict a defendant of a crime for which there is insufficient evidence to vindicate its judgment that the defendant is blameworthy.

*Salamanca, supra,* 300 U.S.App. D.C. at 393, 990 F.2d at 638. Finally, our obligation to assure ourselves that an impartial jury could find guilt beyond a reasonable doubt is especially compelling where, as in this case, the jury, in disposing of other counts of the indictment, appears to have squarely rejected one of the two theories—probably the main one—upon which Jones' AAF conviction is supposed to rest.

## II.

The government claims that by firing at Webb, or by threatening him, Jones attempted to prevent Webb from pursuing Rice, and

---

1. I join the majority in holding that there was sufficient evidence to support Jones' conviction of obstruction of justice in connection with the "Dear Butchie" letter. Jones claims that the government did not prove that he wrote the letter during the period specified in the indictment. The date on which the letter was written, however, is not an element of the offense. *See United States v. Nunez,* 668 F.2d 10, 11 (1st Cir.1981). There is no claim, nor could there be, that Jones' prosecution for writing the letter is barred by the

six-year statute of limitations. *See* D.C.Code § 23–113(a)(2) (1996).

Even if we were to perceive a variance between the indictment and the proof at trial as to when the letter was written—and I agree with the majority that there was no such variance—reversal would be appropriate only if Jones had demonstrated prejudice; and he has not done so. *See Robinson v. United States,* 697 A.2d 787, 789 (D.C.1997).

that Jones also tried to intimidate Webb so that Webb would not report Rice's crime to the authorities. If such conduct had been proved, it would undoubtedly have constituted accessoryship after the fact. *Outlaw v. United States,* 632 A.2d 408, 411 (D.C.1993), *cert. denied,* 510 U.S. 1205, 114 S.Ct. 1326, 127 L.Ed.2d 674 (1994); *Butler v. United States,* 481 A.2d 431, 442–43 (D.C.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985). But the record, fairly viewed, demonstrates, that the AAF conviction cannot be sustained on this theory. Moreover, in its disposition of all those charges which were based entirely on Jones' alleged encounter with Webb, the jury squarely rejected the government's version of what took place.

The only witness to the alleged shooting was Rogest Webb. No other witness corroborated Webb's assertion that Jones shot at him. The police recovered no used shells from the scene of the alleged shooting. The prosecution produced no physical evidence in support of its theory. The government's case with regard to the incident at the cut must therefore stand or fall on Webb's testimony.

In my opinion, no impartial jury could find beyond a reasonable doubt, on the basis of Webb's account, that Jones fired at Webb. This is so because it is obvious from Webb's testimony that the witness himself entertained considerable doubt about the accuracy of the allegation. On the present record, Webb's own reservations must surely translate into a reasonable doubt as a matter of law.

First, Webb admitted that he never saw a weapon in Jones' hand. He explained that he was "too busy running." This acknowledgment is especially remarkable in light of Webb's testimony that he was about fourteen feet from Jones, and that he recognized Jones as "Erky–Berk" from Jones' clothing, including his yellow boots. Webb testified that "[t]he lighting, it was okay, because the light from the street light was shining in the cut a little bit." Unless the streetlight provided more illumination to the ground than to Jones' arm at shoulder level—a distinctly dubious scenario—it is difficult to understand how Webb could have missed seeing a weapon in Jones' hand if indeed there was one.

Moreover, Webb was not at all sure that the firing that he allegedly heard came from Jones. Webb's testimony concluded as follows:

BY MR. JOHNSON (counsel for Jones):

Q You say he was the only one back there at the time. The person who you allege shot at you that you did not see with a gun was the only person you saw. You don't know whether somebody else was standing back there in the dark shooting at you, do you?

A *You're right.*

(Emphasis added.) Webb thus admitted not only that he saw no weapon in Jones' hand, but also that the shooter might very well have been someone other than Jones.

With due respect to the majority, I suggest that the protection afforded to a defendant by the requirement that guilt be proved beyond a reasonable doubt becomes illusory if Jones can be convicted on the basis of the testimony of a witness who admits as much as Webb has admitted. I am astonished that my colleagues detect proof beyond a reasonable doubt where the sole witness was himself so unsure, and where so much is at stake. We are, after all, dealing here with an offense for which Jones could lawfully be sentenced to imprisonment for a maximum term of fifteen years, and for which he was actually but erroneously sentenced to serve fifteen years to life. See maj. op. at 166.

But that is not all. The government's claim that Jones shot at Webb gave rise to five separate charges: assault with intent to kill while armed (AWIKWA); assault with a dangerous weapon (ADW, as a lesser included offense of AWIKWA); possession of a firearm in the commission of a crime of violence (PFCV); carrying a pistol without a license (CPWOL); and one count of obstruction of justice. The trial judge granted Jones' motion for judgment of acquittal as to AWIKWA and CPWOL. The jury acquitted Jones of ADW, PFCV, and the first obstruction of justice charge. Jones was thus cleared of all of the charges which were

based exclusively on his alleged encounter with Webb. There is only one plausible explanation of the disposition of these counts: the prosecution failed to prove, to the jury's satisfaction, that Jones fired at Webb, or that Jones had a pistol, or that Jones attempted to coerce or intimidate Webb at all.

The majority argues that even if Jones did not have a pistol, and even if he did not shoot at Webb, then the judgment should be affirmed anyway, because "even a similitude of such an action by appellant in the cut would suffice to support the conviction." Maj. op. at 165 n. 7. I am baffled by this assertion. Webb never claimed that Jones attempted to intimidate him in any way other than by shooting at him. There was no allegation of verbal threats, or even of threatening gestures. If Jones had no pistol, and if he did not fire—possibilities [2] that Webb acknowledged—then the record is barren of any coercive conduct by Jones against Webb. Surely holding one's hand up with no weapon in it, standing alone, does not constitute accessoryship after the fact to murder! [3]

The majority points out, quite correctly, that inconsistent verdicts are tolerated in criminal cases, and that a conviction may not be set aside for evidentiary insufficiency solely because it is logically inconsistent with the jury's verdict on another count. *See, e.g., United States v. Dobyns,* 679 A.2d 487, 490 (D.C.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997); *cf. Whitaker v. United States,* 617 A.2d 499, 502–03 (D.C.1992). I am not suggesting,

however, that Jones' AAF conviction should be reversed solely on account of such inconsistency. In my opinion, Webb's testimony in itself is replete with reasonable doubt. The jury's disposition of all of the charges arising out of events in the cut provides dramatic corroboration for my assessment, and strongly suggests that Jones' AAF conviction was not based on those events.[4] To ignore this reality on the strength of the rule tolerating inconsistent verdicts is to exalt a doctrine of questionable applicability here over that most precious judicial commodity of all: common sense.

### III.

The government's second theory is that Jones became an accessory after the fact by fleeing with Rice. I quote in its entirety the government's argument on this point in its brief on appeal:

> Appellant also assisted Rice in order to prevent his apprehension when he ran with him as Rice fled the murder scene. Indeed, as the trial court noted, appellant's actions in fleeing with Rice were analogous to those of a lookout who stands guard to ensure that the principal is not caught. Likewise, by accompanying Rice as he fled the area, appellant provided additional protection against anyone who might have tried to apprehend Rice as he tried to effectuate his escape.

The government has cited no authority for the proposition that one becomes an accesso-

---

2. My colleagues downgrade these possibilities as merely "theoretical." Maj. op. at 165 n. 7. The use of a dismissive adjective, however, cannot alter the eminently practical reality that Webb saw no weapon in Jones' hand, nor does it conjure away Webb's acknowledgment that someone other than Jones might have fired the shots that allegedly came in his direction.

3. It is worth noting that the jury also acquitted Jones of obstruction of justice in connection with the events that transpired in the cut. If Jones had threatened Webb, even without a pistol, that too would have constituted obstruction of justice.

4. The majority asserts that Jones' conviction, if based on events at the cut, is "not necessarily inconsistent" with the jury's disposition of the other charges. This assertion is not grounded in reality. Although, as the majority points out,

"[t]he government was not able to introduce a working pistol or discarded shell fragments," this does not rationally account for the relevant acquittals. The use of an imitation pistol would have sufficed to convict Jones of ADW, and no weapon at all was required to render his alleged conduct obstruction of justice. Nevertheless, the jury acquitted Jones both of ADW and of the obstruction of justice charge arising from Webb's testimony.

Even if we assume that there is some hypothetical way in which the majority's defense of the verdict may be reconciled with the jury's disposition of all of the charges based on Webb's account—and I discern no basis for such an assumption—I believe that we should avoid engaging in speculative exercises regarding the theoretically conceivable, and should instead confine ourselves to reasonable probabilities.

ry after the fact solely by running from the scene with the principal. So far as I am aware, there is no such authority.[5]

Under the AAF statute, the government must prove beyond a reasonable doubt that Jones took some action to assist Rice with the specific intent to prevent Rice's arrest, trial, or punishment. *See Butler, supra,* 481 A.2d at 442–43. The record is devoid of such proof. It is true, as the trial judge wrote, that by running away with Rice, Jones made himself available to assist Rice to escape apprehension in the event that such assistance was necessary. A showing of physical availability, however, is a far cry indeed from proof that Jones actually acted as an accessory. Accessoryship after the fact is not a mere state of mind—the government must show that Jones performed an accessorial *act.* The prosecution presented evidence that Jones ran away along with Rice, and nothing more.[6]

There was no proof that Jones' conduct in this case corresponded to that of a lookout in a robbery. In the hypothetical case posited by the government, each member of the robbery team has a separate assignment. The principal's job is to take the money. The lookout's function is to keep his eyes open lest the police or other unwanted "intruders" come upon the scene, and he must warn the principal of any danger. The protection of the principal from apprehension, in other words, is the essence of the lookout's job. His specific intent to do that job may therefore be readily inferred. Indeed, if the lookout did not have the required intent, he would not be a lookout.

In the present case, on the other hand, Rice and Jones fled from the scene together. There was nothing about their joint flight to suggest a division of functions such as that between principal robber and lookout. If anything, Rice was more likely than Jones was to have been "looking out" for, or protecting, his companion, for Rice had already used a handgun, while the evidence that Jones was armed was dubious at best.

Apparently recognizing that the government's "lookout" analogy is inapposite, my colleagues have come up with a new characterization of Jones' conduct, namely, that Jones "*escort[ed]* Rice through two cuts, into K Street, and off into the distance...." (Emphasis added.) "Escorting" Rice certainly sounds more like accessoryship after the fact than "running with" Rice does, but an evidentiary void cannot be filled by resort to creative characterization which has no foundation whatever in the record. The testimony that Jones and Rice ran off together was provided by Janice Dudley, who stated that Jones and Rice "ran out of the cut and they almost bumped into the guy who was running into the cut, so I looked up there and I saw them, they turned around and ran back through the cut...."

In other words, the two men left together. That is all. Just as there is nothing in the record to support the notion that Jones was acting as a lookout, so there is no evidence that he was doing any escorting. On the contrary, as I have noted, Rice not only had a pistol, but had used it to shoot a man to death. His need for an "escort," and especially one whom nobody had seen with a weapon,[7] was illusory. The theory that

---

5. The majority cites *Prophet v. United States,* 602 A.2d 1087 (D.C.1992), in which the defendant, *inter alia,* "followed behind [the principal], looking in all directions as a lookout might do." *Id.* at 1092–93. *Prophet* has no application here. First, the defendant in *Prophet* was tried as an aider and abettor, not as an accessory after the fact. Second, the record in the present case is barren of any information that Jones "looked in all directions as a lookout might do," or that he did anything at all other than run from the scene with Rice.

6. It is, of course, possible that if Jones had seen a policeman or some other source of danger, he would have warned Rice. But assuming that this is true, Jones could not become an accessory

until after an occasion for a warning had arisen and after Jones had provided the warning. Even if the government is accurately assessing Jones' hypothetical state of mind, then, in the words of the song from a musical of the fifties, "The Most Happy Fella," "you can't go to jail for what you're thinking."

7. According to the majority, "Appellant might be presumed to have carried the same weapon Webb thought he had brandished in the cut, and to have remained available to scare off or eliminate any others he and Rice might encounter during their flight." The use of the words "might be presumed to have" and "thought he had brandished" betrays the speculative nature of the majority's reliance on the unseen weapon.

Jones was escorting or guarding Rice is thus not only entirely speculative, but also quite improbable.

Many years ago, Sir William Blackstone provided the following illustrations of accessoryship after the fact:

> [F]urnishing [the principal] with a horse to escape his pursuers, money or victuals to support him, a house or other shelter to conceal him, or open force and violence to rescue or protect him. So likewise to convey instruments to a felon to enable him to break gaol, or to bribe the gaoler to let him escape, make a man an accessory to the felony.

4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 37–38 (Chitty. ed. 1826), quoted in *Outlaw, supra*, 632 A.2d at 411. A more recent and more detailed enumeration appears in *McClain v. State*, 10 Md.App. 106, 268 A.2d 572 (1970):

> [A]ny assistance given to one known to be a felon in order to hinder his apprehension, trial or punishment, is sufficient to make a man an accessory after the fact; as that he concealed him in the house,. or shut the door against the pursuers, until he should have an opportunity to escape; or took money from him to allow him to escape; or supplied him with money, a horse or other necessities, in order to enable him to escape; or that the principal was in prison, and the jailer was bribed to let him escape; or conveyed instruments to him to enable him to break prison and escape. This and such like assistance to one known to be a felon, would constitute a man accessory after the fact.

*Id.* 268 A.2d at 576–77 (quoting PERKINS ON CRIMINAL LAW at 668 (2d ed.)).

These illustrations are not exclusive but, viewed collectively, they furnish a striking contrast to the skimpiness of the evidence in this record. If there were proof, for example, that someone had made an effort to apprehend Rice as Rice and Jones were fleeing, and that Jones had intervened and thwarted the attempted apprehension, then we would, of course, have a different case. As it stands, however, the record shows only that Jones might (or might not) have become an accessory after the fact if the occasion had subsequently arisen. A defendant's hypothesized readiness to engage in accessorial activities in the future will not support a conviction before such conduct has actually occurred.

In *Outlaw, supra*, this court reversed for evidentiary insufficiency the conviction of a defendant for, *inter alia*, directing his younger brother, who had just shot a man to death, to proceed to their aunt's house. *Outlaw*, 632 A.2d at 412–13. The defendant in *Outlaw* also reproved his brother for not having killed the decedent with the first shot, and he remained in the area during the police investigation, thus allegedly intimidating potential witnesses with his presence. All of this was held to be insufficient as a matter of law. In my view, the proof in *Outlaw* was significantly more incriminating in terms of AAF than the "joint flight" evidence in this case.

## IV.

According to the majority, the "Dear Butchie" letter provides further evidence of Jones' guilt of the offense of accessoryship after the fact. This contention does not withstand scrutiny.

The grand jury charged in the indictment that the "Dear Butchie" letter was written some time between December 22, 1994 and May 10, 1995. Jones thus composed this less than sagacious communication at least eight months, and possibly more than a year, after running from the scene of Steven Dunbar's murder on April 9, 1994. A letter that Jones apparently wrote in prison in order to beat the case against himself and Rice provides scant insight as to his state of mind, many months earlier, when he was leaving the area with Arthur Rice.

My colleagues also assert that the "Dear Butchie" letter reflects Jones' consciousness of his own guilt, and that the jury could legitimately so conclude. I cannot disagree. *See, e.g., Mills v. United States*, 599 A.2d 775, 783–84 (D.C.1991) (citations omitted). But consciousness of guilt of what? It takes a considerable stretch, in my opinion, to conclude that Jones was trying in the letter to conceal his guilt of *accessoryship after the*

*fact.* On the contrary, the subject matter of Jones' concern was clearly stated in the letter; Jones wanted a witness to say that "Erik and Arthur [were] standing across the street in the [court] *when the shooting started.*" (Emphasis added.) Jones was thus obviously trying to avoid being charged with involvement in the murder itself, and he wrote nothing about covering up any alleged accessorial acts thereafter.

I have no doubt that the government could legitimately have prosecuted Jones for accessoryship after the fact on account of his attempt, in the "Dear Butchie" letter, to "program" a witness to testify falsely regarding Rice's murderous activities. An AAF conviction may legitimately be based on a defendant's "giving false information to the police in order to divert suspicion away from the felon." 2 WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 6.9 at 169 (1986). Indeed, it is not clear to me how Jones could have mounted any credible defense to an accessoryship charge arising from the letter.

The government, however, charged Jones only with obstruction of justice, and not with accessoryship after the fact, for what he wrote to "Butchie." In the only count in the indictment which alleges an AAF offense, the grand jury charged that Jones was an accessory after the fact to murder *on or about April 9, 1994,* long before the "Dear Butchie" letter was written.

Perhaps Jones was guilty of an uncharged crime—accessoryship after the fact between December 1994 and May 1995. As the court explained in *Salamanca,* 300 U.S.App. D.C. at 392–93, 990 F.2d at 637–38, however, it is in just such a case that the sufficiency of the evidence of the charged offense warrants "particular scrutiny." Because, in my view, Jones' AAF conviction cannot withstand such scrutiny, I must dissent from its affirmance.